Filed 2/28/22  P. v. Rosales CA6
Opinion following transfer from Supreme Court

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SIXTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>CESAR ROSALES,<br><br>    Defendant and Appellant. | H045615<br>(Santa Cruz County<br>Super. Ct. No. F25184) |

## I.     INTRODUCTION

Around 6:15 p.m. on a Saturday in July 2011, defendant Cesar Rosales committed a drive-by shooting in the parking lot of a Target shopping center, killing Gustavo Diaz Zargoza and wounding Zargoza's cousin, Esparanza Salazar.  Defendant was the passenger in a vehicle driven by fellow gang member Miguel Rodriguez, who testified against defendant at trial.

A jury convicted defendant of murder (Pen. Code, § 187; [1] count 1), finding true the special circumstance allegations that the murder was perpetrated by discharging a firearm from a motor vehicle (§190.2, subd. (a)(21)) and that defendant intentionally killed the victim while defendant was an active participant in a criminal street gang and the murder was carried out to further the activities of the criminal street gang (§190.2, subd. (a)(22)); two counts of shooting from a motor vehicle (§ 12034, subd. (c); counts 2 and 4); assault

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

with a deadly weapon (§ 245, subd. (a)(1); lesser included offense to count 3); and active participation in a criminal street gang (§ 186.22, subd. (a); count 5). The jury also found various sentence enhancement allegations true, including that defendant committed counts 1 through 4 for the benefit of, at the direction of, or in association with a criminal street gang (§ 186.22, subd. (b)(1)). The trial court sentenced defendant to life without the possibility of parole (LWOP) consecutive to 55 years to life.

On appeal, defendant initially contended that insufficient evidence corroborates the accomplice testimony; the gang-murder special circumstance finding must be reversed because insufficient evidence corroborates the accomplice testimony that the murder was committed to further the activities of a criminal street gang; the court improperly admitted unauthenticated and unduly prejudicial photographs and videos posted on social media; his counsel was ineffective for failing to elicit evidence of and request jury instructions on voluntary intoxication; the court improperly instructed the jury to consider eyewitness certainty when evaluating eyewitness identification testimony; his counsel was ineffective for failing to object to the prosecution's improper argument; his fair trial rights were violated when the trial court failed to excuse a biased juror; cumulative prejudice from the trial errors requires reversal; his LWOP sentence is cruel and unusual because he committed the offenses when he was 19 years old; and the trial court improperly imposed various fines and fees without determining his ability to pay.

In an opinion filed October 20, 2021, we affirmed the judgment. Defendant filed a petition for rehearing, contending that Assembly Bill No. 333 (2021-2022 Reg. Sess.) (Stats. 2021, ch. 699) (Assembly Bill 333), which amended the STEP Act effective January 1, 2022, and Assembly Bill No. 518 (2021-2022 Reg. Sess.) (Stats. 2021, ch. 441) (Assembly Bill 518), which amended section 654 effective January 1, 2022, would apply retroactively to him. On November 17, 2021, we denied the rehearing petition because the

2

amendments would not be effective until January 1, 2022, but ordered the opinion modified to acknowledge the rehearing petition with no change to the judgment.

Defendant petitioned the California Supreme Court for review. On January 5, 2022, the court granted the petition (case No. S272020) and transferred the matter to this court with directions to vacate our decision and reconsider the cause in light of Assembly Bill 333 and Assembly Bill 518. We vacated our prior decision by separate order.

In supplemental briefing, the parties agree that the amendments to the STEP Act and section 654 apply retroactively to defendant and require that we reverse his conviction of active participation in a criminal street gang, vacate the jury's true findings on the gang-murder special circumstance allegation and the gang enhancement allegations, and remand the matter for resentencing under newly amended section 654. In addition, the Attorney General contends that we should remand the matter to allow the prosecution to elect whether to retry defendant on the gang crime, the gang-murder special circumstance allegation, and the gang enhancement allegations.

For reasons that we will explain, we will reverse the judgment and remand the matter for the prosecution to elect whether to retry defendant on the active participation in a criminal street gang count, the gang-murder special circumstance allegation, and the gang enhancement allegations, and for the trial court to resentence defendant, applying newly amended section 654.

## II.      FACTUAL AND PROCEDURAL BACKGROUND

### A.      *Prosecution Case*

#### 1.      The Incident

On the evening of July 23, 2011, cousins Gustavo Diaz Zargoza, Esparanza Salazar, and Martin Diaz Morales went to the Watsonville Target because Salazar wanted to buy an iPhone. As the trio exited the store around 6:13 p.m., a green car approached slowly and stopped. The vehicle's passenger "gave [Zargoza] this look," and the car drove away. The

3

passenger did not appear to be angry but he stared. No words or gestures were exchanged. The passenger was in the front seat; the only other person in the car was the driver. The passenger was wearing a black cap with the letter "P" on it.

When the group got to their car, Salazar suddenly felt something hit her arm. She turned and saw someone shooting at them from a green car behind them. There was smoke coming from the front passenger window where the passenger was sitting. Two people were in the car, a front passenger and the driver. The passenger side of the vehicle was closest to Salazar. Salazar could not see the passenger's face because he was wearing a hat with the letter "P" on it that was pulled down. More shots were fired, hitting the windows of neighboring cars.

Morales saw that the shots were coming from a small car that had approached them from behind. The male front passenger "kept shooting towards" Zargoza and Salazar from about 12 to 15 feet away. The passenger was wearing a hat and his hand was sticking out of the passenger-side window holding a chrome revolver that Morales thought "was probably a 357." One of the windows in a car parked next to them shattered. Another bullet hit the group's car above its license plate.

Salazar felt weak and sat down. She saw Zargoza next to her and asked him if he had been hit. Zargoza responded that he had been shot in the stomach.

A responding officer performed CPR on Zargoza. Zargoza was gasping for air and a pool of blood formed around his body. Emergency medical responders arrived and treated Zargoza but he died at the scene. An autopsy revealed a gunshot had gone through Zargoza's right arm and entered his chest, traveled through his ribs, lung, and heart, and entered his left lung. The cause of death was blood pooling in Zargoza's chest cavity. A bullet was removed and collected as evidence.

4

Zargoza was wearing a blue nylon belt and blue gym shorts under his jeans. He had a blue bandana in his pants pocket, three dots tattooed on his chest, and "X3" tattooed on his shin. One of his shoes had "X3" written in pen inside of it.

Salazar was taken to the hospital. She had been shot in the right elbow, which destroyed her joint and caused severe bone loss. After two surgeries, Salazar still had pain and weakness in her arm and difficulty working.

### 2. Bystander Eyewitnesses

Joanne Jackson was working at a store next to Target on the day of the incident. She was outside the store on a break around 6:15 p.m. and noticed a green car drive past her very slowly. The car turned and went down the parking aisle in front of her. All of a sudden Jackson heard five loud booms and a car window shatter. Jackson saw that the car with the shattered window was an SUV parked on the right side of the parking aisle, which was on the passenger side of the green car. "[T]hen the green car took off really fast and went to the right." Jackson saw that the car's front passenger window was open. Jackson ran into the store and called 911.

Maria Sanchez had gone to Target with her 11-year-old daughter, arriving around 6:15 p.m. After she parked her SUV and started walking toward Target, she heard "some noise like thunder" and saw that a revolver had been fired by the front passenger in a green Honda. The passenger's stretched-out arm was holding a gray or silver revolver that was aimed outside the passenger's window. Sanchez grabbed her daughter and hid behind some cars.

Shelly Turcotte had gone to Target with her husband. As they were parking, Turcotte heard about five gunshots and saw people scattering. Turcotte then saw a small green Honda or Mazda speed past them. Two men were in the car. The front passenger was wearing a red hat and looking back in the direction of where the shots were fired and a

5

person was lying on the ground. The men appeared to be Hispanic. The car's license plate number contained the number four and the letter U.

The parties stipulated that if called to testify, Sophia Orozco would state that on July 23, 2011 around 6:15 p.m., she saw a green Honda exiting the Target parking lot going extremely fast. Orozco would testify that she saw two people in the front of the vehicle and that the driver, who was male, had a red tattoo on the left side of his neck. Orozco was "sure it was red but is not sure that it was a red lip tattoo as she had initially reported to the police."

### 3. Police Investigation

Santa Cruz County Sheriff's Sergeant Roy Morales responded to the Target parking lot and was shown a still photograph of the suspect vehicle taken from video surveillance footage. The vehicle appeared to be an older, green, four-door Honda Accord. There was some sort of red silhouette in the back of the car and a white spot on its hood.

Based on information that the victim was possibly a Sureño, Sergeant Morales began searching areas where Norteños were known to congregate. After about a half hour, Sergeant Morales saw a similar looking green Honda in the parking lot of an apartment complex. The car was parked in the assigned space associated with Miguel Rodriguez and Witness1. The vehicle's license plate was "4UBF449" and its hood had a fairly large spot of white bird excrement on it. Its hood was warm and there was something reddish in the backseat. Police had the vehicle towed to a secure facility.

Police showed Salazar and Morales approximately 30 photographs of Norteño members, many of whom were members of the Clifford Manor Locos (CML) subset. Defendant and Rodriguez were included in the packet of photos. Neither Salazar nor Morales was able to identify anyone in the photographs.

When police searched the interior of the Honda, they found partially eaten food and four expended 357-Magnum shell casings in a Jack In The Box bag on the front passenger

6

floorboard. There was also a Jack In The Box receipt with a time stamp of 1:52 p.m., July 23, 2011, in a compartment on the passenger's armrest.

Police showed the Jack In The Box employee listed on the receipt photographs of Rodriguez. The employee identified Rodriguez based on the red "C" tattoo on the left side of his neck. Surveillance footage from the Jack In The Box showed the same green Honda Accord going through the restaurant's drive-thru that was on Target's surveillance footage. Rodriguez was driving.

Defendant's mother contacted the police because she was unable to reach defendant after July 22, 2011, which was unusual. Defendant's sister had also sent defendant a text message on July 23, 2011, but he never responded.

In November 2011, police were notified that the DNA profile developed from a swab of the partially eaten food in the Jack In The Box bag on the Honda's front passenger floorboard matched the DNA profile associated with defendant in a DNA database. Police tried to locate defendant and Rodriguez, but were unsuccessful.

Also in November 2011, the Morgan Hill Police Department contacted the Watsonville Police Department about a Ruger .357 revolver that they recovered from Joe "Troubles" Ruiz. The Morgan Hill police had learned from a confidential informant that the gun may have been used in a homicide in Watsonville. A criminalist subsequently determined that the bullet recovered from Zargoza's body was fired from the .357 Ruger revolver.

The case went cold.

On July 23, 2013, Rodriguez was arrested near Mexicali, Mexico on a homicide warrant. Police learned that defendant was working in Aptos and was on felony probation.

Defendant was arrested on July 24, 2013. Two cell phones were found on defendant, which defendant stated were his. Police located a notebook containing various items with defendant's name on it, including his resume; "CML" and "Lonely Boy" were written in the

7

notebook. Defendant was wearing a black Houston Astros hat with a five-point star on it and a red knit cap underneath the hat.

In May 2014, it was determined that the DNA profile developed from defendant's reference swab matched the DNA profile developed from the swabs of the partially eaten food in the Jack In The Box bag. The chance that a randomly selected unrelated person would have the same DNA profile was one in 130 quintillion for Hispanics.[2] Rodriguez was excluded as a source of the DNA developed from the food swabs.

A District Attorney Investigator determined that he had the same arm span as Rodriguez. The investigator sat in the driver's seat of a 2001 four-door Honda Accord and tried to stick his arm through the front passenger window. The investigator "couldn't get close to [the window]" without getting "almost horizontal" and taking his foot off the gas.

### 4. A.R.'s Testimony (Defendant's Former Girlfriend)

A.R. testified that she began dating defendant when he was in Mexico in 2011. A.R. stated that in July 2011, defendant and Rodriguez began living in a room in her grandmother's house in Hijido, Recomodo, a small town. A.R. had not seen her cousin Rodriguez in eight years and had never met defendant before.

A.R. testified that when she asked defendant why he was in Recomodo, he stated that he had committed a crime in the United States. Defendant said that "they had killed a person" because "there had been a gang conflict." According to A.R., defendant said that "they had gone to a store. They were going to prepare a meal at [Rodriguez's] home and when they were in the car going back home they ran into two men and a woman. They passed them. They turned around and they came back to the same place and when they came by [defendant] . . . had gotten the gun and he had fired it because he wanted to feel what it feels like when you would fire it." Defendant stated that "he had killed a person and

---

[2] The prosecution did not present DNA statistical rarity evidence for other ethnicities.

8

he had wounded a woman." Defendant told A.R. that Rodriguez was driving a truck and that the incident happened in Watsonville. Defendant said that they went to Rodriguez's home and then to Tijuana, arriving in Recomodo a week later.

A.R. did not tell anyone what defendant said. Her family knew why defendant and Rodriguez were there. A.R. testified that defendant understood Spanish but did not speak it well. Defendant often called Rodriguez "Demon" and Rodriguez often called defendant "Lonely."

At some point defendant decided to leave because he and Rodriguez were not getting along. Defendant thought it was safe to return to the United States because he saw on the news that Rodriguez was the suspect in the homicide, not him. A.R.'s aunt took defendant to the border. A.R. never saw defendant again. Rodriguez stayed but was eventually arrested at A.R.'s grandmother's house.

A photograph showed defendant celebrating New Year's Eve with A.R.'s family on December 31, 2011.

### 5. Miguel Rodriguez's Testimony (Defendant's Accomplice)

Rodriguez testified that he began associating with Norteños in school, partying with them and fighting Sureños. Growing up, he learned to recognize Sureños by their appearance, dress, and speech. His freshman year he was expelled from Gilroy High School for possessing a knife. At age 16, he began selling methamphetamine with his father until his father's arrest.

Rodriguez testified that when he was 18 years old, he began living with his girlfriend, Witness1. They had a daughter in April 2008. When his father was released from custody, Rodriguez began selling drugs with him again. By age 19 or 20, Rodriguez was a fulltime drug dealer. At some point, Rodriguez's brother Jose began living with Rodriguez and Witness1. Jose socialized with CML members including Patrick Diaz, whose gang name was "Grande," and defendant, whose gang name was "Lonely Boy." Defendant had been

9

recently "jumped into" the gang. Rodriguez got to know the CML members and became friends with them.

Rodriguez stated that the gang members had defendant on a "[t]oughen up program," which involved beating defendant up, and Rodriguez felt bad for him. Rodriguez became closer to defendant and socialized with him daily. Defendant and several other CML members would accompany Rodriguez while he was selling drugs.

At some point, Jose was "jumped into" CML. In order to protect Jose, Rodriguez joined the gang when he was about 20 years old. Rodriguez was "jumped in" and given the gang name "Demon."

Rodriguez testified that gang members were expected to confront Sureños by fighting them; they were not supposed to walk away. Confrontations would start with a whistle or hand signs; other times members would rush a Sureño when they did not want the Sureño to run; and sometimes members would ask a suspected Sureño where he or she was from. If a member walked away from a Sureño, he or she would be violently disciplined by the gang. Members were also supposed to confront people who were staring at, or "mugging," them. Members could not look weak.

Rodriguez stated that members were supposed to make monetary contributions to the gang to help incarcerated members and to buy weapons. To build a reputation within the gang, some members sold drugs, others were smart, and some were fighters or killers. CML members identified with the Cincinnati Red's "C" logo. Members made "C," "M," or "L" hand signs when confronting someone from another gang.

Rodriguez had a "C" tattooed on his neck; a demon on the back of his neck; "CM Loco" on his back; "265" on his rib cage; "X4" on his calf; a "CML . . . hey rag" on his left forearm; and four dots on his face. The four dots identified him as a Norteño affiliate.

10

Rodriguez bought four or five guns off the street before he turned 21. When Rodriguez turned 21 in October 2009, he got a gun permit and bought a .357 Ruger revolver at a Watsonville gun shop.

Rodriguez testified that later in 2009, he was driving defendant, Jose, and a guy from "North Side" in his Chevy Silverado. Someone in the car threw a rock at a group of suspected Sureños. One of the suspected Sureños threw the rock back at Rodriguez's truck. Rodriguez drove home to get his gun. Rodriguez drove the group back to where they saw the suspected Sureños, but the Sureños were no longer there. Rodriguez subsequently located the suspected Sureños in Sureños territory. The individuals threw their hands up and starting walking toward Rodriguez's car. Rodriguez fired five rounds at them. Someone tried to run and fell. Law enforcement was unaware of the incident until Rodriguez told the prosecution about it after trial in this case had started. Rodriguez had not been charged for that offense.

Around 2010, defendant lived at Rodriguez's house and they were together every day. Rodriguez considered defendant his best friend. Toward the end of 2010, defendant went to jail twice. Defendant was placed in a residential treatment program and afterwards lived at a sober living environment. Rodriguez and defendant talked and saw each other periodically.

In February or March 2011, Rodriguez bought a .25 semiautomatic pistol. About a month later, the gun was found by police during a vehicle stop. Rodriguez was arrested and the gun was seized.

Rodriguez stated that in May or June 2011, he sold the .357 revolver to defendant because he needed the money. Rodriguez was no longer selling drugs and had just moved to a new apartment with Witness1 and their daughter. Rodriguez filed the serial numbers off the gun. Defendant was doing well at that point. He was working and was not doing drugs or drinking.

11

Defendant and Rodriguez planned to see each other on July 23, 2011. Rodriguez had borrowed Witness1's father's car, a green Honda Accord. Rodriguez, Witness1, and their daughter went to Jack In The Box. Rodriguez bought some food for defendant and the group picked him up. Defendant was in the front passenger seat and Witness1 and the daughter were in the back. Rodriguez was wearing a red Cincinnati Reds hat; defendant wore a blue New York Yankees hat. Defendant ate the food in the car. Rodriguez drove the group to a liquor store and bought beer and rolling papers. Rodriguez drove them to the woods and they smoked marijuana. At one point while Rodriguez was driving, defendant shot the .357 revolver out the front passenger window. Rodriguez also shot the gun. They threw the shell casing out the window. The group went to the beach and then the discount mall. The group picked up some food and went to Rodriguez and Witness1's apartment.

Rodriguez testified that he and defendant left to buy alcohol and pick up a video game. Rodriguez drove the Honda and defendant was in the front passenger seat. They went to a liquor store, stopped at defendant's house to get the game, and went to Rodriguez's cousin's house to buy marijuana. Defendant had the gun with him.

As Rodriguez drove back to the apartment, defendant asked him to pull into the Target shopping center so that he could meet a girl. While Rodriguez drove toward Target, a man caught Rodriguez's eye. Rodriguez thought the man was a Sureño based on the way he looked at them. The man gave them "a little smirk, like, . . . mugging, looked like laughing at us." The man was with a girl. Rodriguez "flipped him off and threw up [his] four fingers," representing "14." Either defendant or Rodriguez made a derogatory statement about the man. The man reacted by laughing, which Rodriguez took as disrespect. The man was on the passenger side of the car, about 10 feet from defendant.

Rodriguez stated that he circled the car around. Both Rodriguez and defendant said they were "going to get this fool." Defendant said he was going shoot the man. Rodriguez told him that he was "all in" but this was not the place because of the people and the

12

cameras; it was also broad daylight. Rodriguez suggested beating the man up because if they were caught, it would mean less time in jail. Defendant agreed.

Rodriguez testified that he drove the car into the parking aisle where the man was walking. The man was on the Honda's passenger side. As Rodriguez looked for a parking spot to his left, defendant shot the gun five times out of the passenger-side window. Rodriguez called defendant an "idiot" and quickly drove off.

Rodriguez drove them back to the apartment. Defendant put the shell casings in the Jack In The Box bag. They went inside and, without mentioning any details, Rodriguez told Witness1 that he messed up but that "it wasn't [him]." About 45 minutes to an hour after the shooting, Rodriguez saw police looking at the Honda parked in his assigned parking space. Rodriguez told Witness1, "[I]t's done, . . . they're here," and left with defendant.

Once they got out of the apartment complex, Rodriguez called someone to pick them up. They went to Damien Padilla's house. Defendant had the gun with him. Rodriguez told the people there that they needed to hide. Older gang members arrived to check on them. Rodriguez and defendant spent the night. The next day they got a ride to Rodriguez's uncle's house in Gilroy. Rodriguez told his uncle that they had to go to Mexico.

At some point, defendant told Rodriguez that he had left the gun shells in the Jack In The Box bag inside the car. A CML member gave them some money and defendant left the gun with him to get rid of. Rodriguez arranged transportation for himself and defendant to Mexico. They were dropped off in Tijuana and took a bus and a taxi to Hijido, Reacomodo.

Rodriguez testified that he later learned from a CML member that the .357 revolver had been sold to someone named "Troubles."

On July 23, 2013, after defendant had returned to the United States, the Mexican police arrested Rodriguez and transported him to the border where he was picked up by the United States Marshals.

13

Rodriguez testified that he understood that his statement to the police about the offense could not be used against defendant unless Rodriguez testified.[3] Rodriguez stated that at the time of the preliminary hearing, he was placed in a van with defendant. Defendant told Rodriguez that he was not going to turn his back on Rodriguez even though Rodriguez had implicated him; that they were "homies"; his family was praying for Rodriguez; and Rodriguez should keep his head up. Defendant told Rodriguez to "stay strong, they want you real bad to get to me." Rodriguez asked defendant "how much time [he was] willing to do," and defendant responded, "None." Rodriguez thought that was selfish and would affect him "[r]eal bad" because he "would . . . be[] the one getting convicted for it." Rodriguez testified that at no point did defendant get angry with Rodriguez for naming him as the shooter or accuse Rodriguez of lying. Rodriguez subsequently learned that there had been a recording device in the van. The recording was played for the jury.

In the beginning of 2017, Rodriguez reached an agreement with the district attorney. Rodriguez pleaded guilty to voluntary manslaughter and admitted a gang enhancement. Rodriguez was facing a minimum sentence of 13 years and a maximum sentence of 21 years when he testified at trial, unless the court struck the gang enhancement, which would result in a possible sentence of 3 to 11 years. By the time Rodriguez testified, Rodriguez had joined a "dropout gang" for protection.

Rodriguez testified that defendant did not speak Spanish well and sometimes had difficulty speaking Spanish clearly.

Rodriguez identified the .357 Ruger revolver that a criminalist determined had fired the bullet recovered from Zargoza's body as the gun he owned and sold to defendant.

---

[3] The parties stipulated that Rodriguez's statements to the police were given to defendant in 2013 and that the statements would not be admissible against defendant at trial unless Rodriguez testified. The parties also stipulated that the preliminary hearing was held in 2015 and that Rodriguez's statements to the police were admitted against defendant and Rodriguez at the hearing.

14

### 6. Witness1's Testimony (Rodriguez's Former Girlfriend)

Witness1 testified that she began dating Rodriguez in high school. After they graduated, they moved in together and had a daughter.

Witness1 stated that Rodriguez and Jose joined CML at some point; both were jumped in. Gang members socialized at the house she shared with Rodriguez and had gang-related discussions. In 2009, Rodriguez bought a Ruger handgun.

Rodriguez began socializing with defendant in 2009 or 2010 after defendant had been jumped in. Rodriguez and defendant were close. Defendant would often stay with them. Witness1 noticed that gang members would say that defendant was not tough and would call him a derogatory name. Witness1 stated that other CML members thought defendant was weak.

Weeks before the incident at Target in 2011, Rodriguez talked about selling the Ruger to defendant. Witness1 was doubtful that defendant could buy the gun because he did not have any money.

Witness1 testified that on July 22, 2011, she and Rodriguez borrowed her parents' car, a 2000 or 2001 green, four-door Honda Accord. On July 23, Witness1, Rodriguez, and their daughter went shopping and to Jack In The Box. Then they drove around Green Valley Road. Defendant joined them at some point. Witness1 got in the backseat with her daughter and defendant got in the front passenger seat.

As they were driving around the outskirts of town, defendant took the Ruger out of his pocket or waistband, pointed it out the window, and fired once. Witness1 and her daughter were scared, but Rodriguez and defendant acted like this was normal. At some point the group returned to Witness1 and Rodriguez's apartment.

Rodriguez left with defendant in the Honda around 6:00 p.m. At 6:26 p.m., Rodriguez and defendant ran inside and Rodriguez either said that he or they had messed up and he would explain it later. Rodriguez grabbed a hoodie and they ran out. They did not

15

take the car. Hours later, a police officer called Witness1 looking for Rodriguez. Police arrived at the apartment later that night and searched the premises.

A couple of days later, Witness1 saw surveillance footage from the incident on the news. She recognized her father's green Honda on the footage because of the spot of bird excrement on the hood. A man told Witness1 to leave money for Rodriguez, which she did. A couple weeks later, Rodriguez called, asking what happened with the police. He did not mention where he was and she did not ask. Witness1 learned a couple of weeks later that Rodriguez and defendant were in Recomodo, Mexico. Witness1 wired money to Rodriguez monthly.

Rodriguez called Witness1 daily. At some point, he told Witness1 that they had gone to the store, defendant shot someone in the parking lot, and Rodriguez drove away.

### 7. Additional Gang Evidence

#### a. *The Norteños, the Sureños, and the CML Subset*

Watsonville Police Corporal Joseph Perez testified as an expert in criminal street gangs. Corporal Perez stated that there are primarily two rival gangs in Watsonville, the Norteños and the Sureños. Norteños are affiliated with the Nuestra Famila prison gang. Norteños are the Nuestra Familia's street-level gang members. Norteños identify with the letter "N," the number 14, the symbol of four dots or four dots over two lines, the color red, and the term "Norte." Norteños commonly refer to Sureños as "scraps" and use the letter "S" written backwards with a line through it to refer to Sureños disrespectfully. Norteños often wear red clothing to identify with the gang or possess a red bandana or red necklace.

The Sureños are affiliated with the Mexican Mafia prison gang. Mexican Mafia and Sureño members identify with the letter "M," the number 13, the symbol of three dots over two lines, and the color blue. Sureños wear blue clothing or possess a blue object to identify with the gang. Both Norteños and Sureños claim various sports teams' logos to identify

themselves. For example, some Norteños in Watsonville identify with the Washington Nationals' red "W."

Corporal Perez stated that gangs use violence to control people through fear and gang members use violence to gain respect. Members also gain respect by making money for the gang through drug sales and burglaries. It is common for multiple gang members to be involved in the commission of a crime and when multiple members are involved, the crime is commonly committed at the direction of the gang or in association with other gang members. Local street gangs have to pay mandatory taxes to the prison gangs.

Disrespect is met with retaliation. Disrespect can be something as simple as looking at someone the wrong way. If a gang member is disrespected and does not retaliate, the member looks "like a punk" and will be punished.

Corporal Perez testified that if Norteños come into contact with Sureños, at a minimum he would expect them to give each other dirty looks, or "mug" each other, and stare each other down. Gang signs might be thrown. Even if an individual is not wearing gang colors or symbols, "both groups know exactly that that person is not from their group . . . and [is] their enemy . . . by just looking at them," based on the way the person walks or his or her mannerisms. Sometimes a violent interaction starts with a gang member asking, "Where are you from?"

Within the Norteño gang in Watsonville, there are seven subset gangs "or hoods" that Norteño gang members identify with. The subsets were started by individuals in the neighborhoods where they grew up. The Nuestra Famila has rules that all Norteños from different subsets have to follow in jail, including that they join together as one and do not disrespect each other.

To become a subset member, a person often must be "jumped in." Typically the person will be beaten up by some of the gang members to show his or her toughness and

17

then be asked to commit a crime on behalf of the gang. The Watsonville subsets hold meetings that only jumped-in subset members can attend.

Corporal Perez stated that the Clifford Manor Locos subset, or CML, formed in the late 1980's at the Clifford Manor Apartments in Watsonville. CML members identify with Norteño symbols and also with the letter "C," the numbers 265 and 240, the term "cliffas," and the Cincinnati Reds' "C" logo. CML claims the Clifford Manor Apartment complex as its territory.

### b. *Law enforcement contacts and other gang evidence*

In December 2008, Watsonville police responded to a call regarding three minors smoking marijuana at a park. Several individuals were found nearby, including Patrick Diaz. Diaz was on probation with "gang terms." A probationer with gang terms must not associate with known gang members or wear gang-related clothing. Also present were Mario Fragoso, Oscar Ortiz, and defendant. Diaz's belt buckle had a "C" engraved on it. Diaz had a "W" tattooed on his neck; "ENE" tattooed on his stomach; the huelga bird tattooed on his left arm; "Cliffas," "Norte," and a red strawberry, for Watsonville, tattooed on his forearms; and "CM Loco" tattooed on the top of his hands. Ortiz was wearing a red belt.

On January 21, 2009, Watsonville police responded to Clifford Manor Apartments. Defendant, Miguel Morales, Miguel Narez, Damien Padilla, Victor Ramos, Jeremy Robles, Fragoso, Ryan Heinrichs, Michael Heinrichs, and Ortiz were contacted in the complex's playground. Padilla, Ramos, and Robles were on probation with gang terms. Padilla had a box cutter with an exposed blade in his pocket. Fragoso had an "M" and a "C" tattooed on his elbow and was a known CML member. Narez had a "C" tattooed on his face; a large "W" tattooed on his neck; "Cliffas" tattooed on one of his arms; and was a known CML member. Robles had a five-point star tattooed on his neck, which was a Norteño tattoo.

18

Robles had "CM" tattooed on his chest. Ramos had two bars with four dots tattooed on the left side of his neck and "CML" on the back of his neck.

On April 4, 2009, a Watsonville police officer observed a vehicle run a stop sign and speed away. Upon locating the car, the officer approached the three occupants. Defendant ran but was apprehended. Defendant had a pair of tweezers in his pocket. Defendant also had a baggie and a straw with white powdery residue on them. The other two individuals were brothers who were Norteños who associated with the North Side Chicos subset. One brother wore a red shirt and a cap with a red brim and a red "W" and had an "N" and an "S" tattooed on his chin; "chicos" across his neck; four dots on his wrist; and "Beast" on his hand. The other brother had a tattoo of his nickname, "Inocente," on a hand; "NSWC" across his back; "chicos" across his chest; and "Lonely Boy" across his lower back. Lonely Boy was the nickname of a North Side Chicos gang member who had been murdered.

On May 6, 2009, Defendant and Padilla went to the Watsonville police department to pick up a cell phone and a bicycle that had been seized during an investigation. When the police seized the cell phone, it was in Jerry Robles's and Narez's possession. Both Robles and Narez were on probation with gang terms. Robles was a documented Norteño and Narez was affiliated with the CML.

Padilla stated that the cell phone belonged to him. The phone had a screen saver with the letters "CML" and the word "Norte" on it. It also had an "S" with a line through it. A photo on the phone depicted "taste da norte." Padilla admitted that he was on probation with gang terms; defendant stated that he was on probation. A record check revealed an outstanding warrant for defendant's arrest. A cell phone in Padilla's pocket had "Norte" as its screen saver. Defendant stated that the phone was his. Both Padilla and defendant were wearing with belt buckles with the letter "C" on them. Padilla had "1," "4," and "Watsonville" tattooed on his chest; a "C" his right hand; an "M" and "CML" on his left hand; and a "W" tattooed behind his left ear. Padilla was thought to be a CML member.

19

On June 9, 2009, defendant was stopped by Watsonville police for a vehicle infraction. Defendant was wearing a Cincinnati Reds hat with a "C" on the front and had a belt with a "C" on the buckle. When defendant was asked if he was a CML member, defendant responded that he was "just a Norte[ñ]o."

In July 2009, Watsonville police contacted defendant and Ryan Heinrichs. Both were on juvenile probation with gang terms. Ryan was a CML member. Ryan's phone had a photograph depicting defendant, Nathan Heinrichs, and an unidentified male posing in front of a fence with "265" written on it. The men were making CML hand symbols. Ryan's phone also had digital images of "X4." Defendant's phone had a background with "Norte" on it.

Defendant was contacted again on August 5, 2009. Defendant was on probation with gang terms. Defendant was wearing a Cincinnati Reds hat with a "C" on the front. When defendant was asked if he was a CML member, defendant responded that he socializes with Norteños.

On August 11, 2009, Watsonville police responded to River Park, which had problems with gang activity. Defendant, Rodriguez, Jose, Nathan Heinrichs, Ryan Heinrichs, and Johnny Castillo were socializing in the park. Five of the men were on probation with gang terms; all of the men were documented gang members or associates; and some were associated with CML. Jose had "X4"; "265"; and "C" tattoos. Castillo had "X"; "4"; "Clifford"; "Manor"; and "CML" tattoos. Nathan had a "Watson" tattoo and was wearing a red belt with a "W" on it. Ryan had a tattoo stating "RIP Brandon Gil." Gil was a Norteño gang member who had been murdered. Rodriguez had a "Mongolian" hairstyle, which was a Norteño haircut.

On September 10, 2009, Watsonville police determined that Jose's cell phone contained photographs of a red bandana and a Cincinnati Reds "C" hat; a writing containing the word "Grande" and the phrase "Clifford Manor 14 Locos," with the "S" in Locos

20

crossed out; a writing that said "Watsonville Norteño gang, XIV, Clifford Manor Locos, X Grande 4, . . . Lonely Boy, and Casper"; and Norteño related cartoons.

On October 2, 2009, Watsonville police contacted defendant when the vehicle defendant was traveling in was stopped for a traffic infraction. Defendant was still on probation with gang terms. Rodriguez was driving and was wearing a red shirt and a red belt. Rodriguez was a documented gang member. When defendant was asked why he was in the company of a Norteño member, defendant responded that he was "caught . . . slipping."

On November 17, 2009, defendant was contacted with Rodriguez and Padilla. When the Watsonville police officer first noticed the group, they were running. When the group saw the officer, they slowed to a walk and went in different directions. Defendant and Rodriguez got into a Chevy Silverado and began to drive away. Rodriguez was driving. Padilla and defendant were on probation with gang terms. Defendant was known to police as a Norteño associate and a CML member. Rodriguez was wearing a sports hat with a black "C" on the front.

On January 8, 2010, defendant was contacted in the front passenger seat of a truck driven by Rodriguez. Defendant was on probation with gang terms. Rodriguez was wearing a red checkered shirt, a red cross around his neck, and a white belt with a "C" on the buckle. Rodriguez's clothing and tattoos were consistent with CML membership. When asked why he was in the presence of a Norteño, defendant responded that "the only reason he's getting caught is because [the officer was] targeting him."

On May 5, 2010, Watsonville police responded to the YMCA's handball courts, where there had been a lot of gang activity, and contacted a group of seven people. Padilla and Samuel Duran were on probation with gang conditions. Padilla and Joseph Granada[4]

---

[4] The reporter's transcript refers to "Joseph Granada" and "Joseph Granados." We will refer to him as "Granada."

21

were known CML members. The other four individuals who were present were defendant, Gilbert Torres, Jonathan Cruz, and Michael Heinrichs. Michael had "Clifford" tattooed on his right arm; "Manor" tattooed on his left arm; and was wearing a red belt with a belt buckle with a "C" on it. Granada had four dots tattooed near his left eye; "265" above his right eyebrow; "CML" tattooed on the back of his head; "X4" tattooed on his chest; and was wearing a red belt and a red hat with "Nor Cal" on it. Padilla had a "C" tattooed on his right earlobe and right hand; an "M" on his left earlobe and left hand; a large "W" on his neck; "1," "4," and "Watonsville" on his chest; and "Norte Saldado" and "Clifford Soldado" tattooed under his neck. Duran had one dot tattooed on his right elbow and four dots tattooed on his left elbow. Cruz had "Watsonville" tattooed on one of his arms. Torres was wearing red shorts.

On May 22, 2011, defendant was the passenger in a vehicle observed by a Watsonville police officer. When the car parked, the driver got out and quickly walked out of view. Defendant was contacted. Defendant was on probation and admitted that he was an active Norteño member. Defendant was wearing a red and black striped shirt and a Cincinnati Reds hat with a "C" on the front. The driver was later identified as Raymond Carthall. Carthall was gang affiliated, on parole, and not supposed to associate with other known gang members.

When defendant was arrested in this case in July 2013, one of the cell phones in his possession had two music folders, one labeled "CML" with a money sign and the other labeled "C $T." A money sign is used to signify an "S" with a line through it. The music was "Norteño gangster rap-type music." One of the songs was called, "Scrap is Going to Die," which was about killing Sureños. Another song was called, "Going to Kill a Scrap," which contained a lyric about "pulling drive-bys." Defendant had two teardrop tattoos on the webbing of his index finger.

22

Watsonville Police Detective Kristine Rangel testified that CML member Alejandro "Happy" Flores made rap music and videos promoting the gang. Flores's rap videos were posted on YouTube. Defendant appears in Flores's video for the song, "Roped Off," which was posted on March 15, 2017. Narez, the Heinrichs, and Fragoso also appear in the video, as do other CML members. The individuals are wearing clothing consistent with CML membership. Flores also references defendant in the video for the song, "Still Crazy," which was posted on July 26, 2016.

Flores had a public Instagram account. One of the photographs posted on Flores's account depicted Diaz, Anthony "Risky" Hernandez, and defendant, whose nickname was "Lonely Boy." Diaz, Hernandez, and defendant were making CML gang signs with their hands. The photograph was posted on March 5, 2017. There was also a photograph of defendant posing that was posted on July 15, 2017, and a photograph of defendant making a "C" with his hand that was posted on March 21, 2017. The three photographs appeared to have been taken at the Santa Cruz jail. Flores is a known CML member and has a Mongolian hairstyle. The Instagram account also had the posting, "Lonely, keep your head up, my boy."

### c. *Predicate offenses*

Corporal Perez testified that on December 18, 2009, a Sureño was shot at a trailer park on Green Valley Road. The police had no suspects until Rodriguez admitted that he was responsible for the shooting.

Corporal Perez stated that in 2009, Adrian Rodriguez committed an assault with a deadly weapon, a firearm, with a gang enhancement. Also in 2009, Patrick Diaz committed three assaults with a deadly weapon.

Corporal Perez testified that in 2010, Jose assaulted his girlfriend with a firearm. Corporal Perez stated that on July 8, 2011, Alvaro Melendrez was unlawfully in possession of firearm and was subsequently convicted of that offense.

23

Corporal Perez stated that Ulysses Vasquez had been convicted of robbery with a gang enhancement and that Ulysses Castillo had been convicted of unlawful possession of a firearm.

### d. *Expert opinions*

Corporal Perez opined that Melendrez, Vasquez, Castillo, Jose, Adrian Rodriguez, and Diaz were active CML members on July 23, 2011.

Based on the circumstances of defendant's police contacts, defendant's statements to the police, the gang indicia on defendant's phone, the photographs of defendant in the presence of CML members, and Rodriguez's testimony that defendant was "a jumped-in [CML] member," Corporal Perez opined that defendant was an active member of CML on July 23, 2011. Corporal Perez also opined that Rodriguez was a CML member in 2011 based on his admission of gang membership and his gang tattoos.

Corporal Perez testified that Zargoza's clothing and tattoos were consistent with Zargoza being a Sureño affiliate. Zargoza had no contacts with law enforcement.

Corporal Perez opined that at the time of the murder, CML's primary activities were robbery, assault with a deadly weapon, unlawful possession of firearms, and drug sales. Corporal Perez testified that based on the facts of this case and Rodriguez's testimony, killing Zargoza would benefit CML because it would "put[] fear in rival gang members," as it shows that CML members are not afraid to shoot a rival in broad daylight, around families. It would also make the community fearful of the gang, which would decrease the public's willingness to report crimes, and help recruit new members. In Corporal Perez's opinion, killing Zargoza would benefit defendant and Rodriguez because it would heighten their reputation and status in the gang as it shows they have no fear and would commit violence against their perceived rivals. Corporal Perez opined that Zargoza's murder was committed by two gang members in association with each other.

24

**B.**     *Defense Case*

Defendant did not testify or call any witnesses.

**C.**     *Charges, Verdicts, and Sentence*

Defendant was charged by second amended information with special circumstances murder (§§ 187, subd. (a), 190.2, subd. (a)(21), (22); count 1); two counts of shooting from a motor vehicle (§ 12034, subd. (c); counts 2 and 4); attempted murder (§§ 664/187, subd. (a); count 3); and active participation in a criminal street gang (§ 186.22, subd. (a); count 5). As to counts 1 through 4, it was alleged that defendant personally used and/or personally and intentionally discharged a firearm causing great bodily injury or death (§ 12022.53, subds. (b), (c), (d)), and that he committed the offenses for the benefit of, at the direction of, or in association with a criminal street gang (§ 186.22, subd. (b)(1), (5)). As to counts 2, 3 and 4, it was alleged that defendant personally inflicted great bodily injury (§ 12022.7, subd. (a)). Regarding counts 2 and 3, it was alleged that defendant inflicted great bodily injury or death as a result of discharging a firearm from a motor vehicle (§ 12022.55). As to count 3, it was alleged that defendant personally used a firearm (§ 12022.5).

A jury convicted defendant of counts 1, 2, 4, and 5 and of assault with a deadly weapon (§ 245, subd. (a)(1), the lesser included offense to attempted murder charged in count 3. The jury found the sentence enhancement allegations true except it did not find that defendant violated section 12022.53 regarding count 3 because the allegation was not submitted to the jury. The jury also found a section 12022.55 enhancement true on count 4.[5]

---

[5] The prosecution did not allege a section 12022.55 enhancement on count 4 and the trial court did not instruct on section 12022.55. In response to our request for supplemental briefing regarding the jury's true finding on the uncharged enhancement, defendant concedes that the jury's finding should be upheld because he impliedly consented to an informal amendment of the information and "the jurors were instructed on all the elements of section 12022.55." The Attorney General argues that the charging error was harmless. We accept defendant's concession. (See *People v. Toro* (1989) 47 Cal.3d 966, 976,

The trial court sentenced defendant to LWOP consecutive to 55 years to life and imposed various fines and fees.

## III.    DISCUSSION

### A.    *Corroboration of Accomplice Testimony*

Defendant contends that insufficient evidence corroborates Rodriguez's accomplice testimony in violation of section 1111 and his due process rights.[6] The Attorney General counters that Rodriguez's testimony is sufficiently corroborated by defendant's admissions, bystander testimony, and DNA evidence.

#### 1. Legal Principles

Section 1111 mandates that "[a] conviction can not be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof."

"This statute reflects the Legislature's determination that ' "because of the reliability questions posed by" ' accomplice testimony, such testimony ' "by itself is insufficient as a matter of law to support a conviction." ' [Citation.] 'Thus, for the jury to rely on an accomplice's testimony about the circumstances of an offense, it must find evidence that, " 'without aid from the accomplice's testimony, tend[s] to connect the defendant with the crime.' " ' [Citation.] ' "The entire conduct of the parties, their relationship, acts, and conduct may be taken into consideration by the trier of fact in determining the sufficiency of the corroboration." ' [Citation.]" (*People v. Rodriguez* (2018) 4 Cal.5th 1123, 1128.) This includes the defendant's statements and conduct. (*People v. Gurule* (2002) 28 Cal.4th 557, 628 (*Gurule*).)

---

disapproved on another ground in *People v. Guiuan* (1998) 18 Cal.4th 558, 568, fn. 3; see also *People v. Houston* (2012) 54 Cal.4th 1186, 1227-1228.)

[6] The trial court instructed the jury with CALCRIM No. 335 that Rodriguez was an accomplice to the crimes as a matter of law.

" 'The corroborating evidence may be circumstantial or slight and entitled to little consideration when standing alone, and it must tend to implicate the defendant by relating to an act that is an element of the crime.' " (*People v. Abilez* (2007) 41 Cal.4th 472, 505 (*Abilez*).) The independent evidence need not corroborate the accomplice as to every fact on which the accomplice testifies. (*People v. Davis* (2005) 36 Cal.4th 510, 543.) " ' "Although the corroborating evidence must do more than raise a conjecture or suspicion of guilt, it is sufficient if it tends in some degree to implicate the defendant." ' " (*People v. Szeto* (1981) 29 Cal.3d 20, 27 (*Szeto*).)

" 'The trier of fact's determination on the issue of corroboration is binding on the reviewing court unless the corroborating evidence should not have been admitted or does not reasonably tend to connect the defendant with the commission of the crime.' [Citations.]" (*Abilez*, *supra*, 41 Cal.4th at p. 505.)

### 2. Rodriguez's Testimony Was Sufficiently Corroborated

Relying primarily on *People v. Pedroza* (2014) 231 Cal.App.4th 635 (*Pedroza*), defendant argues that without Rodriguez's testimony, there is insufficient evidence connecting him to the offense. In *Pedroza*, an accomplice testified to the defendant's involvement in the murder, which occurred sometime between 10:00 and 10:50 p.m. (*Id.* at pp. 639-640.) "[A]side from the [accomplice's] testimony, the evidence relating to defendant was: (1) defendant was in the same gang as the victim and [the accomplice]; (2) the gang—which had over 400 members—was experiencing frequent in-house murders; and (3) at some time after 11:00 p.m., [a gang member's wife] heard a banging noise at her house; a few hours later, between 2:00 and 3:00 a.m., she saw defendant in her garage, along with [three fellow gang members, including the accomplice]." (*Id.* at p. 651.) The Court of Appeal determined that the independent evidence did not sufficiently corroborate the accomplice's testimony because it "established only that defendant had a general connection to the victim and other perpetrators—shared gang membership—and he was

27

seen associating with the other perpetrators after the murder, away from the crime scene." (*Id.* at p. 651.)

We find *Pedroza* distinguishable. As detailed below, evidence of defendant's admissions, defendant's opportunity to commit the offense, the manner of death, and eyewitness testimony sufficiently corroborate Rodriguez's testimony.

A.R. testified that defendant told her that "he had killed a person and he had wounded a woman." A.R. stated that defendant said "they had gone to a store" and Rodriguez was driving. "They were going to prepare a meal at [Rodriguez's] home and when they were in the car going back home they ran into two men and a woman. They passed them. They turned around and they came back to the same place and when they came by [defendant] . . . had gotten the gun and he had fired it because he wanted to feel what it feels like when you would fire it." Defendant stated that "they returned to [Rodriguez's] home and then they left, both of them." Defendant also told A.R. that "there had been a gang conflict."

Defendant's admissions, as testified to by A.R., echoed Rodriguez's testimony about the offense. They were also consistent with Salazar's eyewitness testimony. A.R. testified that she learned about the offense from defendant and that she had never spoken to Rodriguez about it. In *Pedroza*, there was no comparable evidence—i.e., testimony regarding the defendant's admissions—linking the defendant to the crime. "The necessary corroborative evidence for accomplice testimony can be a defendant's own admissions." (*People v. Williams* (1997) 16 Cal.4th 635, 680 (*Williams*); accord, *People v. Avila* (2006) 38 Cal.4th 491, 563 (*Avila*).)

In addition to A.R.'s testimony on defendant's admissions, Rodriguez's testimony was corroborated by evidence of the manner of death, a gunshot fired from a .357 Ruger revolver, and DNA evidence from the food in Jack In The Box bag on the passenger seat floorboard that provided circumstantial evidence of defendant's presence on the date of the

28

offense in the front passenger seat of the vehicle from which the gunshot was fired. Also, Witness1 testified that Rodriguez and defendant had left Witness1 and Rodriguez's apartment in the vehicle around 6:00 p.m., which was approximately 15 minutes before the murder, and returned about 20 to 25 minutes later, "grabbed a sweater," and "ran out," leaving the apartment complex on foot with the car parked in the complex's lot. The car belonged to Witness1's father, and when Witness1 had traveled in the vehicle with Rodriguez and defendant earlier in the day, Rodriguez drove and defendant sat in the front passenger seat. Witness1 stated that defendant had the gun with him in the vehicle, which she described as a "Ruger."

One of the victim's cousins who was present during the shooting testified that the vehicle's male front passenger had fired shots from what was "probably a 357." A bystander testified that the vehicle's front passenger had fired shots from a revolver. And the parties stipulated that if called to testify, a witness who saw the vehicle leaving the crime scene would state that the driver "had a red-colored tattoo on the left side of his neck." Rodriguez had a red "C" tattooed on the left side of his neck. All of the above evidence corroborates Rodriguez's testimony.

*Abilez* is instructive. There, the defendant claimed that "apart from [the accomplice's] uncorroborated testimony, there was no evidence identifying him as the assailant." (*Abilez*, *supra*, 41 Cal.4th at p. 505.) The California Supreme Court held otherwise, finding sufficient corroboration on the issue of identity based partly on two witnesses' testimony "that, in the days before the murder, they heard defendant state he wished to kill the victim." (*Id.* at pp. 505-506; see also *Gurule*, *supra*, 28 Cal.4th at p. 628 [finding that the accomplice testimony "was amply corroborated by defendant's own extrajudicial statements to police," among other evidence].) In addition, "[a]ll the critical aspects of [the accomplice's] testimony were corroborated," based on evidence of the manner of death and the defendant's and another visitor's presence at the victim's home on

29

the evening of the murder, where a witness overheard the defendant and the victim argue and overheard the victim scream. (*Abilez*, *supra*, at p. 505.)

Defendant asserts that A.R.'s testimony does not provide sufficient corroboration because it contains "multiple inaccuracies" and because A.R. did not speak English and defendant did not speak Spanish well. The inaccuracies included A.R.'s testimony that Rodriguez was driving a truck, instead of a sedan, and that defendant said that "*they* had killed a person." (Italics added.) But A.R. also testified that defendant told her that "he had gotten the gun" and that "he had killed a person and he had wounded a woman." Moreover, a Spanish-speaking investigator testified that in jail calls, defendant spoke Spanish to his mother, sister, and son. The investigator had no difficulty understanding defendant although sometimes defendant misinterpreted words.

Based on our careful review of the record, we conclude that A.R.'s testimony on defendant's admissions, Witness1's testimony regarding defendant's opportunity to commit the offense, and the other evidence detailed above sufficiently corroborate Rodriguez's accomplice testimony because it " 'reasonably tend[s] to connect' " defendant with the crimes without aid from Rodriguez's testimony. (*Szeto*, *supra*, 29 Cal.3d at p. 27, italics omitted; see also *Abilez*, *supra*, 41 Cal.4th at p. 505 [we are bound by " '[t]he trier of fact's determination on the issue of corroboration . . . unless the corroborating evidence should not have been admitted or does not reasonably tend to connect the defendant with the commission of the crime.' "].)

B.      *Corroboration of Accomplice Testimony Regarding Gang-Murder Special Circumstance*

Defendant contends that the gang-murder special circumstance finding must be reversed because there is "insufficient evidence to corroborate Rodriguez's testimony that the murder was [committed] to further the activities of the criminal street gang," as required

by section 190.2, subdivision (a)(22) and former section 186.22, subdivision (f).[7] The Attorney General asserts that section 1111's accomplice-testimony corroboration requirement does not apply to the gang-murder special circumstance because the gang-murder special circumstance "required proof of defendant's motive for the murder, not proof of a separate crime."

In *People v. Hamilton* (1989) 48 Cal.3d 1142, 1177 (*Hamilton*), the California Supreme Court held that "[w]hen the special circumstance requires proof of some other crime, that crime cannot be proved by the uncorroborated testimony of an accomplice. But when . . . it requires only proof of the motive for the murder for which defendant has already been convicted, the corroboration requirement of section 1111 does not apply." (Footnote omitted.) The court observed that section 1111 provides that " '[a] *conviction* cannot be had upon the testimony of an accomplice unless it be corroborated.' " (*Hamilton*, *supra*, at p. 1176.) The court analogized section 1111's corroboration requirement to the requirement of proof of corpus delicti for special circumstances that "require[] proof of some crime other than the charged murder," but not for special circumstances that "require[] only proof of the defendant's motive for the murder or some other matter which does not constitute a separate criminal offense," and "adopt[ed] the same distinction here." (*Hamilton*, *supra*, at p. 1177.)

The California Supreme Court applied *Hamilton*'s holding in *Avila*, *supra*, 38 Cal.4th at page 570. There, the court determined that section 1111 did not apply to "the witness-killing special circumstance" because that special circumstance "did not require proof of a crime other than the charged murder; rather, it required that '[t]he victim was a witness to a crime who was intentionally killed for the purpose of preventing his or her testimony in any criminal . . . proceeding . . . .' (§ 190.2, subd. (a)(10)." (*Avila*, *supra*, at p. 570.)

_____

[7] Although we determine that the jury's true finding on the gang-murder special circumstance allegation must be vacated based on the retroactive application of newly amended section 186.22 (at pp. 59-62, *post*), we reach defendant's sufficiency of the evidence claim because if the claim were successful, retrial on the allegation may be barred under double jeopardy principles.

Here, the gang-murder special circumstance required proof that "defendant intentionally killed the victim while . . . defendant was an active participant in a criminal street gang, as defined in [former] subdivision (f) of Section 186.22, and the murder was carried out to further the activities of the criminal street gang." (§ 190.2, subd. (a)(22).) Unlike the felony-murder special circumstance, for example, which requires proof that "[t]he murder was committed while the defendant was engaged in . . . the commission of" an enumerated felony (§ 190.2, subd. (a)(17)(A)-(L)), and thus, requires proof of a crime's commission in addition to the charged murder (see *People v. Howard* (1988) 44 Cal.3d 375, 414, superseded on another ground as recognized in *People v. Shoemake* (1993) 16 Cal.App.4th 243, 253), the gang-murder special circumstance does not require proof of a crime other than the charged murder. Thus, under the court's guidance in *Hamilton* and *Avila*, we determine that section 1111's corroboration requirement does not apply to the gang-murder special circumstance.

But even if we assume that section 1111 requires corroboration of Rodriguez's testimony as it pertains to the gang-murder special circumstance, defendant's claim fails because there is sufficient corroborating evidence in the record. As we stated above, " '[t]he corroborating evidence may be circumstantial or slight and entitled to little consideration when standing alone, and it must tend to implicate the defendant by relating to an act that is an element of the crime.' " (*Abilez*, *supra*, 41 Cal.4th at p. 505.)

First, there is evidence that corroborates Rodriguez's testimony that defendant was a CML member. Witness1 testified that defendant had been "jumped in[to]" CML a year or two before the murder. In addition, there was extensive testimony regarding defendant's police contacts in the years before the offense in the presence of CML members and defendant's gang-related clothing. Before trial, defendant was visited by CML members in jail.

There is also evidence that the offense was gang related. The victim's cousin testified that when the suspect vehicle initially drove by them before the shooting, "going really slowly" and then "stopp[ing]," the passenger "stared" and "gave [the victim, Zargoza,] this look." Zargoza was wearing a blue nylon belt and blue gym shorts under his jeans and had a blue bandana in his pants pocket. He also had three dots tattooed on his chest and "X3" tattooed on his shin, and his shoe had "X3" written inside of it.

Although Zargoza's blue clothing and tattoos were not visible, a former Watsonville gang detective testified that Norteños have told him that "sometimes . . . they just know" when someone is "[a] rival gang member[] even if that person is not wearing blue." Similarly, the prosecution's gang expert testified that "someone could not be wearing any colors and neither group could be wearing any colors and both groups know exactly that that person is not from their group and [is] . . . their enemy . . . by just looking at them," based on the person's "mannerisms" and the way the person "carr[ies] themselves." The expert stated that in his experience, a gang conflict can often "start . . . with a look," and if a "Sureño is found alone by a group of Norteños," can end up with the person being chased, shot, and killed. The expert also testified that gangs use "[v]iolence . . . almost like a tool" to "put[] the fear in people" and "keep[] them in control. So violence against anybody is the tool that's used the most . . . because that's how you control an area." According to the prosecution's gang expert, the CML is a Norteño subset. At the time of the offense, CML's primary activities were robbery, assault with a deadly weapon, unlawful possession of firearms, and drug sales.

Taken together, this independent evidence "tends to connect . . . defendant" (*People v. McDermott* (2002) 28 Cal.4th 946, 986 (*McDermott*)) to a killing perpetrated "while . . . defendant was an active participant in a criminal street gang," as defined in former section 186.22, subdivision (f), that "was carried out to further the activities of the criminal street gang" (§ 190.2, subd. (a)(22)).

33

Defendant argues that there is "insufficient evidence to corroborate Rodriguez's testimony that the murder was [committed] to further the activities of the criminal street gang" because the gang expert's opinion that the murder benefitted CML was based partly on Rodriguez's testimony. However, "[t]he corroborating evidence need not by itself establish every element of the crime." (*McDermott*, *supra*, 28 Cal.4th at p. 986.) Moreover, as we observed above, the expert testified that gangs use violence to control an area and make people fearful. To the extent that independent evidence was required to demonstrate that Zargoza's murder furthered CML's activities, this testimony provided the necessary " 'circumstantial or slight' " corroboration. (*Abilez*, *supra*, 41 Cal.4th at p. 505.)

In sum, we determine that section 1111 does not require corroboration of Rodriguez's accomplice testimony as it pertains to the gang-murder special circumstance, but even if corroboration is required, the record contains sufficient corroborating evidence.

### C.  *Admission of Instagram Photographs and YouTube Videos*

Defendant contends that the trial court erred when it admitted as evidence of defendant's gang status photographs posted on Instagram on March 5 and March 25, 2017, and videos posted on YouTube on July 26, 2016 and March 17, 2017, because the evidence was irrelevant as it had not been authenticated. Defendant also contends that the evidence's admission violated Evidence Code section 352 (section 352) because it was cumulative, lacked probative value, and was unduly prejudicial. The Attorney General argues that the claims have been forfeited and that the trial court did not abuse its discretion when it admitted the evidence.

#### 1.  Trial Court Proceedings

The prosecution moved in limine to present evidence of defendant's "gang activity while in custody." Included in the proffered evidence were photographs and a video of defendant "flashing gang signs both alone and in the company of [two CML] members."

The prosecution asserted that the evidence was "highly relevant" to show defendant was an active participant in the gang on the date of the offense.

At the hearing on the motion, the prosecution stated that the video "was produced by a member of the defendant's gang while the defendant is in custody singing about Norte[ñ]o gangs in Watsonville and then there is an image of [defendant] in that video. [¶] . . . [¶] The footage appears to be on a similar visit as the Instagram photos that feature [defendant] and some other gang members in custody throwing up a C for [CML]. [¶] The portion of this video has him with one of those same people. And the rapper is singing about freeing the person that is there with [defendant]."

Defendant asserted that he had "foundational concerns about the video," stating that he did not "know anything about when it was produced." Defendant observed that he appeared in the video for "less than a second," and was wearing orange jail clothes. Defendant argued that the video was "duplicative of [the] still photographs, which [were] a little more easy to pin down from a timeframe perspective," and of Rodriguez's anticipated testimony on CML members. Defendant argued that the video was "prejudicial given [his] role in it is minute compared to other actors that appear in this video."

The court ruled that the video was admissible under section 352 because it was not "significantly more prejudicial than probative," was not unduly time consuming, and would not confuse the jury. The court stated that defendant "reserve[d] his right to contest the [video's] admissibility based on other evidentiary concerns, for example, cumulative and/or lack of foundation."

The prosecution introduced the photographs and two videos during Detective Rangel's testimony. Detective Rangel testified that the photographs were posted on CML member Alejandro Flores's Instagram account. When the prosecution attempted to move the photographs into evidence, defendant "object[ed] on the foundational level with the witness." After an unreported bench conference, the court sustained the objection. The

prosecution asked Detective Rangel whether she had seen the photographs on Flores's Instagram account, and Detective Rangel responded that she had. When the prosecution again asked to move the photographs into evidence, defendant stated that he had no objection and the court admitted them.

The photograph posted on March 5, 2017, depicted defendant with two CML members. The individuals were making CML gang signs with their hands and were wearing jail clothes. One of the comments posted about the photograph mentioned defendant's "nickname . . . Lonely Boy." The photograph posted on March 21, 2017, showed defendant in the jail visiting area making a "C" with his hand.[8]

Detective Rangel testified that Flores was a rapper and that she had viewed Flores's videos for the songs, "Still Crazy" and "Roped Off." The court admitted the videos into evidence at the prosecution's request after defendant had no objection.

Detective Rangel stated that the "Still Crazy" video was posted on YouTube on July 26, 2016. In it, Flores referenced defendant with the line, "Free my other brother Lonely, looking at life." In "Roped Off," which was posted on YouTube on March 15, 2017, defendant appeared in custody with "Happy Diaz," who was also in custody. Several other CML members appeared in the video. The individuals wore clothes consistent with CML membership and appeared at various "gang strongholds."

### 2. Forfeiture

Evidence Code section 353 provides that "[a] verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous admission of evidence unless: [¶] (a) There appears of record an objection to or a motion to exclude or to strike the evidence that was timely made and so stated as to make clear the specific ground of the objection or motion." Thus, " 'the "defendant's failure to make a

---

[8] A photograph posted on Flores's account on July 15, 2017, was also admitted into evidence. Defendant raises no claim on appeal regarding that photograph.

timely and specific objection" on the ground asserted on appeal makes that ground not cognizable.' " (*People v. Partida* (2005) 37 Cal.4th 428, 434 (*Partida*).)

The evidentiary objection " 'must be made in such a way as to alert the trial court to the nature of the anticipated evidence and the basis on which exclusion is sought, and to afford the People an opportunity to establish its admissibility.' [Citation.] What is important is that the objection fairly inform the trial court, as well as the party offering the evidence, of the specific reason or reasons the objecting party believes the evidence should be excluded, so the party offering the evidence can respond appropriately and the court can make a fully informed ruling. If the court overrules the objection, the objecting party may argue on appeal that the evidence should have been excluded for the reason asserted at trial, but it may not argue on appeal that the court should have excluded the evidence for a reason different from the one stated at trial. A party cannot argue the court erred in failing to conduct an analysis it was not asked to conduct." (*Partida*, *supra*, 37 Cal.4th at p. 435.)

Here, defendant has forfeited his claims that the trial court erred when it admitted the Instagram photographs. Although defendant initially objected to the photographs' admission on foundation grounds, which the trial court sustained, defendant did not state any further objection when the prosecution renewed its request to move the photographs into evidence after laying additional foundation. In fact, defendant stated that he had no objection to the photographs' admission after additional foundation was laid. Accordingly, defendant's claims regarding the photographs are " 'not cognizable.' " (*Partida*, *supra*, 37 Cal.4th at p. 434.)

We also conclude that defendant has forfeited his claim that the trial court improperly admitted the YouTube videos because they were irrelevant as they were not authenticated. While defendant stated during the in limine hearing that he had "foundational concerns" about the video evidence because he did not "know anything about when it was produced," the trial court directed defendant to renew his foundational objection when the evidence was

37

introduced. Defendant failed to do so, specifically stating that he had no objection to the videos' admission. Thus, defendant's claim that the videos were inadmissible because they were unauthenticated and irrelevant is also " 'not cognizable' " on appeal. (*Partida*, *supra*, 37 Cal.4th at p. 434.)

Defendant further contends that the trial court abused its discretion under section 352 when it admitted the videos because they were cumulative, lacked probative value, and were unduly prejudicial. Defendant argues that "the prosecution had already introduced numerous other evidence to prove that [he] was a gang member," and that video evidence indicating that he may have been a gang member in 2016 and 2017 was of little probative value to whether he was a gang member in 2011. Defendant observes that he did not appear in one of the videos and had little control over what was written about him. In addition, defendant argues that the video evidence "evoked an emotional bias against [him]" because it showed him smiling, associating with gang members post-arrest, and seemingly unworried about the serious charges he faced.

These claims were also not preserved. Defendant argued during the in limine hearing that the video evidence was "duplicative of [the] still photographs" and of Rodriguez's testimony. However, the trial court stated that it was "not making a decision as to . . . whether [the video evidence] potentially, depending on what evidence is presented, becomes cumulative," and directed defendant to "contest [its] admissibility based on . . . cumulative[ness]" when the evidence was presented. Defendant did not do so, lodging no objection when the prosecution requested to move the videos into evidence during trial, and has therefore forfeited the claim.

Lastly, regarding the prejudicial nature of the video evidence, defendant argued below that it was "prejudicial given that [his] role in it is minute compared to other actors that appear in [it.]" We conclude that this argument did not "fairly inform the trial court . . . of the *specific reason or reasons* [defendant now] believes the evidence should

[have] be[en] excluded"—namely, that its probative value was minimal given that the videos were posted years after the charged offense and were made by someone else and that it "evoked an emotional bias against [him]." (*Partida*, *supra*, 37 Cal.4th at p. 435, italics added.)

For these reasons, we conclude that defendant's claims regarding the Instagram photographs and YouTube videos are " 'not cognizable' " on appeal. (*Partida*, *supra*, 37 Cal.4th at p. 434.)

### 3. Ineffective Assistance of Counsel

Defendant contends that if we find that his claims regarding the Instagram photographs and the YouTube videos have been forfeited, his trial counsel was ineffective for failing to adequately object to their admission. Defendant argues that "there simply could have been no rational tactical purpose for counsel's failure to object."

To prevail on a claim of ineffective assistance of counsel, a criminal defendant must establish both that his or her counsel's performance was deficient and that he or she suffered prejudice. (*Strickland v. Washington* (1984) 466 U.S. 668, 687 (*Strickland*).) The deficient performance component of an ineffective assistance of counsel claim requires a showing that "counsel's representation fell below an objective standard of reasonableness" under prevailing professional norms. (*Id.* at p. 688.) "When a claim of ineffective assistance is made on direct appeal, and the record does not show the reason for counsel's challenged actions or omissions, the conviction must be affirmed unless there could be no satisfactory explanation. [Citation.]" (*People v. Anderson* (2001) 25 Cal.4th 543, 569 (*Anderson*).) Regarding prejudice, a "defendant must show that there is a reasonable probability"— meaning "a probability sufficient to undermine confidence in the outcome"—"that, but for counsel's unprofessional errors, the result of the proceeding would have been different." (*Strickland*, *supra*, at p. 694.) Prejudice requires a showing of "a ' "demonstrable reality," " not simply speculation.' " (*People v. Fairbank* (1997) 16 Cal.4th 1223, 1241.) "If it is

easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed." (*Strickland*, *supra*, at p. 697.)

Here, the record is silent regarding why counsel did not object to the two Instagram photographs now challenged on appeal and thus "affords no basis for concluding that counsel's omission was not based on an informed tactical choice." (*Anderson*, *supra*, 25 Cal.4th at p. 569.) For example, "counsel may have desired not to highlight the evidence by making an objection. '[T]he decision whether to object . . . is highly tactical, and depends upon counsel's evaluation of the gravity of the problem and whether objection or other responses would serve only to highlight the undesirable [evidence].' [Citation.]" (*People v. Seumanu* (2015) 61 Cal.4th 1293, 1313, omitted (*Seumanu*).) Because there is a "satisfactory explanation" for counsel's failure to object to the photographs, defendant's ineffective-assistance claim regarding the photographs must be denied. (*Anderson*, *supra*, at p. 569.)

Regarding the Instagram videos, which counsel initially objected to on different grounds than those asserted here, we conclude that defendant has not demonstrated that he was prejudiced by their admission because he has not shown "a reasonable probability" that but for their admission, "the result of the proceeding would have been different." (*Strickland*, *supra*, 466 U.S. at p. 694.)

The evidence against defendant was strong. Defendant admitted to his former girlfriend after he fled to Mexico that "he had killed a person" and that "there had been a gang conflict." Defendant's accomplice, Rodriguez, testified that they had seen a suspected Sureño near Target who had disrespected them and that they were "going to get [him]." Rodriguez stated that defendant fired a .357 revolver five times out the passenger window as Rodriguez drove down a parking aisle and that defendant later admitted that he had left the expended shell casings in a Jack In The Box bag in the car. Rodriguez also testified that he and defendant were CML members.

40

As we detailed above, Rodriguez's testimony was amply corroborated by other evidence, including bystander testimony identifying the vehicle's passenger as the shooter and the driver as a man with a red tattoo on his neck, which Rodriguez had, and DNA evidence linking defendant to the Jack In The Box bag, which was found on the front passenger floorboard and contained four .357 shell casings. Moreover, the videos were not more inflammatory than the evidence of Zargoza's murder and seemingly did not evoke an emotional response as the jury did not find defendant guilty as charged, convicting him of assaulting Salazar with a deadly weapon rather than attempted murder.

In sum, we reject defendant's claim that his counsel was ineffective for failing to adequately object to the Instagram photographs and YouTube videos because defendant has failed to meet his burden under *Strickland* as he has shown neither deficient performance nor prejudice.

### D. *Counsel's Failure to Elicit Voluntary Intoxication Evidence and to Request Voluntary Intoxication Instructions*

Defendant contends that his trial counsel was ineffective for failing to elicit evidence that defendant was intoxicated during the offense and for failing to request voluntary intoxication instructions. The Attorney General asserts that defendant's claim fails primarily because defendant has failed to show that there were no tactical reasons for the omissions.

As stated above, to prevail on a claim of ineffective assistance of counsel, a criminal defendant must establish both that his or her counsel's performance was deficient and that he or she suffered prejudice. (*Strickland*, *supra*, 466 U.S. at p. 687.)

Defendant contends that his trial counsel "could have elicited information from Rodriguez and Witness[1] . . . that [he] was under the influence" during the murder. However, the record is silent regarding the reason for counsel's decision not to elicit evidence of defendant's voluntary intoxication from Rodriguez and Witness1 and thus

"affords no basis for concluding that counsel's omission was not based on an informed tactical choice." (*Anderson*, *supra*, 25 Cal.4th at p. 569.) Given that Rodriguez testified on cross-examination that despite defendant's history of "alcohol-related behavior," he was "doing better" at the time of the offense, which was consistent with his testimony on direct examination and with defendant's mother's testimony, perhaps counsel determined that a voluntary-intoxication defense was not factually supported.

Defendant also contends that his counsel was deficient for failing to request jury instructions on voluntary intoxication. Defendant asserts that there was substantial evidence to support the instruction based on evidence that his accomplice "Rodriguez was a drug user and a drug dealer"; on the day of the offense, defendant and Rodriguez twice went to a liquor store and twice bought marijuana; Rodriguez admitted that he was " 'high on weed' " when he was shooting in the woods with defendant before the offense; and defendant had "an alcohol addiction problem."

However, "[a] defendant is entitled to such an instruction only when there is substantial evidence of the defendant's voluntary intoxication and the intoxication affected the defendant's 'actual formation of specific intent.' " (*Williams*, *supra*, 16 Cal.4th at p. 677); see also *People v. Verdugo* (2010) 50 Cal.4th 263, 295.) Even assuming "th[e] scant evidence" on which defendant relies constitutes substantial evidence of his voluntary intoxication, which is doubtful, "there was no evidence at all that voluntary intoxication had any effect on defendant's ability to formulate intent." (*Williams*, *supra*, at pp. 677-678.) Thus, counsel was not remiss for failing to request voluntary intoxication instructions. (See *People v. Gray* (2005) 37 Cal.4th 168, 219-220 [counsel not ineffective for failing to request jury instructions unsupported by substantial evidence].)

### E.     *Eyewitness Identification Instruction*

Defendant contends that the trial court violated his federal due process rights when it instructed the jury on eyewitness identification testimony with CALCRIM No. 315 because

42

the instruction told the jury to consider an eyewitness's level of certainty when evaluating his or her testimony. Defendant argues that because eyewitness certainty is not a reliable predictor of accuracy, the instruction was erroneous and lowered the prosecution's burden of proof. The Attorney General counters that the claim has been forfeited and that there was no eyewitness identification testimony as none of the bystander eyewitnesses identified defendant as the shooter.

Pursuant to CALCRIM No. 315, the trial court instructed the jury, "You have heard eyewitness testimony identifying the defendant. As with any other witness, you must decide whether an eyewitness gave truthful and accurate testimony." The court listed 15 "questions" for the jury to consider, including, "How certain was the witness when he or she made an identification?" The court also stated, "The People have the burden of proving beyond a reasonable doubt that it was the defendant who committed the crime. If the People have not met this burden, you must find the defendant not guilty."[9] Defendant did not object to the instruction.

---

[9] The entirety of the trial court's eyewitness identification instruction stated: "You have heard eyewitness testimony identifying the defendant. As with any other witness, you must decide whether an eyewitness gave truthful and accurate testimony. [¶] In evaluating identification testimony, consider the following questions: Did the witness know or have contact with the defendant before the event? [¶] How well could the witness see the perpetrator? [¶] What were the circumstances affecting the witness's ability to observe, such as lighting, weather conditions, obstructions, distance, and duration of observation? [¶] How closely was the witness paying attention? [¶] Was the witness under stress when he or she made the observation? [¶] Did the witness give a description and how does that description compare to the defendant? [¶] How much time passed between the event and the time when the witness identified the defendant? [¶] Was the witness able to pick a perpetrator out of a group? [¶] Did the witness ever fail to identify the defendant? [¶] Did the witness ever change his or her mind about the identification? [¶] How certain was the witness when he or she made an identification? [¶] Are the witness and the defendant of different races? [¶] Was the witness able to identify other participants in the crime? [¶] Was the witness able to identify the defendant in a photographic or physical lineup? [¶] Were there any other circumstances affecting the witness's ability to make an accurate identification? [¶] The People have the burden of proving beyond a reasonable doubt that it

43

In *People v. Sánchez* (2016) 63 Cal.4th 411 (*Sánchez*), the defendant claimed the trial court erred when it instructed jurors pursuant to CALJIC No. 2.92 that they should consider " 'the extent to which the witness is either certain or uncertain of the identification,' " because the language was at odds with "scientific studies that conclude there is, at best, a weak correlation between witness certainty and accuracy." (*Sánchez, supra*, at p. 461, fn. omitted.) The California Supreme Court determined the defendant's claim had been forfeited by his failure to request modification of the instruction in the trial court. (*Id.* at pp. 461-462; see also *People v. Ward* (2005) 36 Cal.4th 186, 213 (*Ward*) [finding no sua sponte duty to modify CALJIC No. 2.92 and no due process violation].)

Here, like the defendant in *Sánchez*, defendant forfeited any challenge to the trial court's eyewitness identification instruction by failing to object to the instruction or request its modification. (See *Sánchez, supra*, 63 Cal.4th at pp. 461-462; see also *Ward, supra*, 36 Cal.4th at p. 213.)

Moreover, in *People v. Lemcke* (2021) 11 Cal.5th 644, 646 (*Lemcke*), the California Supreme Court recently rejected the defendant's due process challenge to CALCRIM No. 315.[10] The court found "nothing in CALCRIM No. 315's instruction on witness certainty that operates to 'lower the prosecution's burden of proof.' " (*Lemke, supra*, at p. 657.) Nor did the instruction violate the defendant's due process rights "by denying him 'a "meaningful opportunity to present a complete defense" ' " or by rendering the trial fundamentally unfair. (*Id.* at pp. 660-661; but see *id.* at pp. 647-648 [referring the issue to the Judicial Council for evaluation of how the instruction can be "modified to avoid juror confusion regarding the correlation between certainty and accuracy," and directing trial

---

was the defendant who committed the crime. If the People have not met this burden, you must find the defendant not guilty."

[10] The defendant in *Lemcke* objected to the CALCRIM No. 315 instruction. (*Lemcke, supra*, 11 Cal.5th at p. 652.)

courts to "omit the certainty factor from CALCRIM No. 315 unless the defendant requests otherwise"].)

We are bound by *Lemke* and likewise conclude that the instruction did not lower the prosecution's burden of proof or otherwise violate defendant's due process rights. (See *Lemcke*, *supra*, 11 Cal.5th at pp. 657, 660-661.) Thus, even if defendant's challenge to CALCRIM No. 315 were not forfeited, and assuming the bystanders' identifications of the passenger as the shooter constituted an eyewitness identification, defendant's claim fails.

### F.      *Failure to Object to Prosecutorial Misconduct During Argument*

Defendant contends that his counsel was ineffective for failing to object to prosecutorial misconduct during rebuttal argument. Defendant claims that the prosecutor committed misconduct when he told the jury that A.R.'s testimony describing Rodriguez as "a sangrone [*sic*]" did not "necessarily" translate to "conceited or arrogant," but instead "means that you're an asshole," because the prosecutor's translation was not evidence. Defendant also claims that "the prosecutor misled the jury into believing that [he] was cold blooded and was willing to let his mentor and good friend Rodriguez . . . be the fall guy, when in reality, [defendant's nonadmitted confession to the police] helped Rodriguez obtain a light sentence." The Attorney General argues that no misconduct occurred and that even if the prosecutor's statements constituted misconduct, the statements were harmless.

The general rules applying to claims of prosecutorial misconduct are as follows: "A prosecutor's conduct violates the federal Constitution only when it is ' " 'so egregious that it infects the trial with such unfairness as to make the conviction a denial of due process.' " ' [Citations.] A prosecutor's conduct that does not rise to the level of a constitutional violation will constitute misconduct under state law only if it involves ' " 'the use of deceptive or reprehensible methods to attempt to persuade either the court or the jury.' " ' [Citation.] A prosecutor is given wide latitude to vigorously argue his or her case and to make fair comment upon the evidence, including reasonable inferences or deductions that

45

may be drawn from the evidence. [Citation.]" (*People v. Ledesma* (2006) 39 Cal.4th 641, 726 (*Ledesma*).) "When attacking the prosecutor's remarks to the jury, the defendant must show that, '[i]n the context of the whole argument and the instructions' [citation], there was 'a reasonable likelihood the jury understood or applied the complained-of comments in an improper or erroneous manner. [Citations.] In conducting this inquiry, we "do not lightly infer" that the jury drew the most damaging rather than the least damaging meaning from the prosecutor's statements. [Citation.]' [Citations.]" (*People v. Centeno* (2014) 60 Cal.4th 659, 667.)

" 'A defendant may not complain on appeal of prosecutorial misconduct unless in a timely fashion, and on the same ground, the defendant objected to the action and also requested that the jury be admonished to disregard the perceived impropriety.' [Citation.] A defendant whose counsel did not object at trial to alleged prosecutorial misconduct can argue on appeal that counsel's inaction violated the defendant's constitutional right to the effective assistance of counsel." (*People v. Lopez* (2008) 42 Cal.4th 960, 966 (*Lopez*).) "Keeping in mind that '[a]n attorney may choose not to object for many reasons, and the failure to object rarely establishes ineffectiveness of counsel' [citation], we examine each instance of alleged misconduct." (*Williams*, *supra*, 16 Cal.4th at p. 221.)

### 1. Translation of "Sangr[ó]n[]"

A.R. testified that she and Rodriguez were not close and that she did not like him because he "thought very highly of himself and was conce[it]ed."

During closing argument, defense counsel asserted that "Rodriguez is a liar" whose testimony should be disregarded, and that A.R.'s testimony regarding defendant's "alleged confession [was] unreliable" because she was Rodriguez's cousin and had been in a relationship with defendant.

The prosecutor asserted in rebuttal that inspectors learned of A.R. when Rodriguez's family members in Mexico suggested that they speak to her because she had been involved

46

with defendant. The prosecutor argued, "That's how they came across [A.R.], not because she came up wanting to divulge this information to help her cousin, the cousin that she described in the Spanish word, sangr[ó]n[], which doesn't just necessarily mean conceited or arrogant, I don't think the translation does it justice. To be clear, you call somebody a sangr[ó]n[], that means that you're an asshole, that's what that means. Make no mistake, [A.R.], she doesn't have love for [Rodriguez]."

Although a prosecutor has "wide latitude to vigorously argue his or her case and to make fair comment upon the evidence" (*Ledesma*, *supra*, 39 Cal.4th at p. 726), A.R.'s purported use of the word "sangr[ó]n[]" to describe Rodriguez was not in evidence, nor was the prosecutor's translation of A.R.'s testimony. Thus, the remark constituted misconduct under state law. As the California Supreme Court explained in *People v. Hill* (1998) 17 Cal.4th 800, 827-828 (*Hill*), referring to facts not in evidence "is 'clearly . . . misconduct' [citation], because such statements 'tend[] to make the prosecutor his [or her] own witness—offering unsworn testimony not subject to cross-examination. It has been recognized that such testimony, "although worthless as a matter of law, can be 'dynamite' to the jury because of the special regard the jury has for the prosecutor, thereby effectively circumventing the rules of evidence." [Citations.]' 'Statements of supposed facts not in evidence . . . are a highly prejudicial form of misconduct, and a frequent basis for reversal.' [Citation.]"

We conclude, however, that defendant has not established that his counsel was deficient for failing to object to the prosecutor's remark or that he was prejudiced by it. (See *Lopez*, *supra*, 42 Cal.4th at p. 966.) As we have stated, " '[d]eciding whether to object is inherently tactical, and the failure to object will rarely establish ineffective assistance.' " (*Id.* at p. 972.) Here, counsel could have reasonably surmised that the prosecutor's labeling of Rodriguez as "an asshole" was not detrimental to his argument that Rodriguez's testimony should be disregarded, even if the prosecutor attributed the use of the word

47

"sangr[ó]n[]" to A.R. Or, "defense counsel may simply have desired not to highlight the comment by objecting." (*Gurule*, *supra*, 28 Cal.4th at p. 610.)

Nor has defendant persuaded us that counsel's nonobjection resulted in prejudice. The prosecutor's comment was brief; the jury had ample opportunity to assess A.R.'s and Rodriguez's credibility and demeanor during their testimony; and the jury was instructed that "[n]othing that the attorneys say is evidence" and that it "must rely on the [interpreter's] translation" of witnesses' testimony. Given the strength of the evidence against defendant, as we have detailed above, we find no "reasonable probability" that had counsel objected to the prosecutor's statement and the jury been admonished to disregard it, "the result of the proceeding would have been different." (*Strickland*, *supra*, 466 U.S. at p. 694.)

### 2. Misleading the Jury

Defendant was interviewed by the police in 2013. During the interview, defendant admitted, "Fine, I did it, bro'. Yeah, I shot him. [¶] . . . [¶] . . . Five times, all five rounds." Defendant also stated, "[Rodriguez] had nothing to do with it. He just drove by, I shot five times. Then he drove off." Defendant continued, "[Rodriguez] was trying to tell me, he was trying to get me to stop. He told me to stop three times. I didn't listen, I still did it."

In a motion in limine, the prosecution stated that it did not seek admission of defendant's confession to the police in its case in chief because the confession occurred after defendant had invoked his right to remain silent. The prosecution sought permission to impeach defendant with the confession if defendant testified. The trial court excluded evidence of the confession in the prosecution's case in chief but indicated that it would allow the introduction of inconsistent statements if defendant testified. Defendant did not testify and none of his statements to the police were admitted into evidence.

The parties stipulated at trial that Rodriguez's statements to the police were given to defendant in 2013 and that the statements would not be admissible against defendant at trial unless Rodriguez testified. The parties also stipulated that the preliminary hearing was held

in 2015 and that Rodriguez's statements to the police were admitted against defendant and Rodriguez at the hearing.

Rodriguez testified at trial that during a break in the preliminary hearing, he was placed in a van with defendant. As relevant here, defendant told Rodriguez that they were "brothers, homies," and to "stay strong, they want you real bad to get to me." Rodriguez asked defendant "how much time [he was] willing to do," and defendant responded, "None, bro." Rodriguez thought that was "[s]elfish" and would affect him "[r]eal bad" because he "would . . . be[] the one getting convicted for it." Rodriguez testified that at no point did defendant get angry at him for naming defendant as the shooter or accuse Rodriguez of lying.

Rodriguez testified that he decided to cooperate with the prosecution in October 2016. When asked why he "waited[ed] so long" to cooperate, Rodriguez responded, "Because I still had hope that [defendant] would man up and accept whatever he had coming, say the truth, say he shot someone, try to get . . . a deal for him and I would take whatever they offered me."

During rebuttal argument, the prosecutor asserted: "[Defendant,] the so-called family member[,] is willing to just look the other way and let [Rodriguez] take the full fall, knowing darn well what he did, and then he's in the van telling him, you've got to stay strong, you know, because the only way they can get to me is by getting to you and getting you to testify. [Defendant] has the gall to tell [Rodriguez] to keep his mouth shut so he can walk. I mean, give me a break, that's a dirt bag move, that is downright dirt bag, even on the street. Like [Rodriguez] said, you got to own up to what you do, you got man up for what you do. [Rodriguez] manned up and he's acknowledged what he's done, and we know from the transportation van that [defendant] never said, what the hell are you doing, accusing me of murder, what the hell you doing, accusing me of shooting, why did you put me in the passenger seat firing that . . . gun if you knew damn well that wasn't me. . . .

49

[Defendant] told [Rodriguez], keep your mouth shut because they want your statement, and . . . when [defendant] says, they want your statement, that's because he knows that everything that is said by [Rodriguez] is what's the truth."

Defendant contends that the prosecutor's comments were misconduct because they were misleading as "the prosecutor knew that [defendant] had taken responsibility and told the police he was the shooter and told the police Rodriguez did not ask him to shoot." Defendant also argues that it was improper for the prosecutor to "accuse[] [defendant] of being a 'dirt bag' " and of "let[ting] take Rodriguez take the fall" given defendant's confession.

As we stated earlier, a prosecutor has "wide latitude to vigorously argue his or her case." (*Ledesma*, *supra*, 39 Cal.4th at p. 726.) A prosecutor's "argument may be strongly worded and vigorous so long as it fairly comments on the evidence admitted at trial or asks the jury to draw reasonable inferences and deductions from that evidence." (*Seumanu*, *supra*, 61 Cal.4th at p. 1330.) Based on the evidence of defendant's statements in the van telling Rodriguez to "stay strong," "they want you real bad to . . . get to me," and that he was unwilling to do any "time" in this case, it was not improper for the prosecutor to argue that defendant "ha[d] the gall to tell [Rodriguez] to keep his mouth shut so he can walk" and to call it "a dirt bag move." The argument was a fair comment on the evidence, and "[u]sing colorful or hyperbolic language will not generally establish prosecutorial misconduct." (*People v. Peoples* (2016) 62 Cal.4th 718, 793.) Thus, defense counsel was not remiss in failing to object to those remarks. (See *People v. Thomas* (1992) 2 Cal.4th 489, 531 [because there was no misconduct, "counsel was not ineffective in making no objection"].)

The prosecutor also argued, "[Defendant] has the gall to tell [Rodriguez] to keep his mouth shut so he can walk. Like [Rodriguez] said, you got to own up to what you do, you got man up for what you do. [Rodriguez] manned up and he's acknowledged what he's done." While Rodriguez testified that he waited to cooperate with the prosecution to see if

50

"[defendant] would man up," the prosecutor's argument implies that defendant did not "man up," which is at odds with defendant's confession to the police. A prosecutor commits misconduct when he or she misleads the jury on the facts or the law. (See *Hill*, *supra*, 17 Cal.4th at pp. 825, 845; *People v. Daggett* (1990) 225 Cal.App.3d 751, 758 [a prosecutor may not mislead jurors by asking them "to draw an inference that they might not have drawn if they had heard the evidence the judge had excluded"].) And to the extent that the prosecutor was referring to defendant's failure to plead guilty, "a defendant's character may not be impugned because he [or she] has elected to stand trial." (*People v. Rusling* (1969) 268 Cal.App.2d 930, 938.)

Because defendant did not object to the comment, he must establish that his counsel performed deficiently and demonstrate "a reasonable probability" that the trial result would have been different had an objection to the remark been lodged and sustained. (*Strickland*, *supra*, 466 U.S. at p. 694.) Defendant fails to do so.

First, counsel reasonably could have decided not to object to the remark to avoid bringing further attention to it. (See *Seumanu*, *supra*, 61 Cal.4th at p. 1313.) Second, the evidence against defendant was strong. As detailed above, Rodriguez, defendant's accomplice, testified that defendant was the shooter, and Rodriguez's testimony was amply corroborated by evidence of opportunity, the manner of death, and eyewitness testimony that the passenger was the shooter. Moreover, A.R. testified to defendant's admission that "he had killed a person and had wounded a woman." In addition, the challenged comment did not " 'serve to fill an evidentiary gap in the prosecution's case.' " (*People v. Vargas* (1973) 9 Cal.3d 470, 480.) And the jury was instructed that it "must not be biased against . . . defendant just because he has been . . . brought to trial" and that the attorneys' "remarks are not evidence." Given the strength of the evidence against defendant and the court's instructions, any deficient performance based on counsel's failure to object to the brief remark would have been harmless. (See *Williams*, *supra*, 16 Cal.4th at pp. 222-224.)

## G. *Biased Juror*

Defendant contends that his convictions must be reversed because a sitting juror had an actual bias against him, which violated his federal and state constitutional rights to a fair trial. The Attorney General argues that the record does not demonstrate that a juror had an actual bias.

### 1. Trial Court Proceedings

On November 28, 2017, the court informed the parties that college students had observed the trial and that a professor had contacted the district attorney's office because a student wrote a report stating that a juror told her that he thought defendant was guilty. The court and the parties agreed that they needed to determine "who made this statement and what the context was." The court observed that the report contained "a series of inaccuracies," but stated that "if indeed that is as an accurate comment, I possess distinct concerns with that individual being able to stay on the jury any longer."

As relevant here, the report, dated November 7, stated that the student "sat in on a hearing for case number F19741 [*sic*] Cesar Rosales Vs. the People" and that the case was "extremely long." The report recounted that "[t]here were three key witnesses who testified against the defendant, including his friend/gang member . . . Rodriguez, his mother and his ex-girlfriend from Mexico," and purported to summarize their testimony. The report also stated, "During the recession [*sic*] a man outside the courthouse and I were talking about parking and he told me 'This case isn't looking good for the defendant, he's going to be convicted of first degree murder[.]'[] Based on the mass of evidence and testimony against the defendant and the statement from the juror. My prediction is that the defendant will be found guilty."

On November 30, the student was questioned by the court and counsel. When asked if she had spoken with a juror, the student responded that she talked to a juror on November 7 or 8 but was unsure if he "was from this case." The student added, "He did tell me that he received a slip for parking because he was a juror prior, like, two weeks before

52

when I talked to him." The student had been uncertain whether she was "allowed to park out there" and had asked the juror where he parked. The juror told her that "he parked out there with the slip that he was provided" and asked the student if she was "writing for the paper." The student responded that she was writing for a class. The student told the court, "And he told me that this case wasn't looking good for the defendant and he thinks that he will be guilty. [¶] However, the man -- it . . . was a heavy-set older man, but his hair wasn't as white as all the other heavy-set men I saw today." The student stated that she did not recognize any of the men on the jury. The court noted that the student had been in the courtroom for 45 minutes to an hour, which gave her an opportunity to observe the jury.

When asked by the prosecution whether she recognized any of the people sitting in the jury box, the student responded, "I didn't believe so." The student stated that the man "act[ed] . . . like . . a juror" because "[he] had that [parking] slip." The student said that the juror did not specify the case he served on. At the prosecution's request, the student described the juror's appearance.

Defense counsel asked whether the student had been watching the testimony on the day she spoke with the juror and the student stated that she had. When asked whether the juror "[w]as . . . also in this courtroom watching some of [the] testimony," the student responded, "That I'm not sure." Defense counsel asked if the juror specified that defendant was going to be convicted of first degree murder, and the student responded, "He said guilty," and, "I put the first degree murder part in [the report]. He said guilty." The student believed that she spoke to the juror on the date of opening statements.

At the conclusion of questioning, defense counsel stated that he was concerned because he was unaware of "any other trial in the immediate courtroom to our left. By that day, we had our impaneled jury and all the excused jurors were long gone for at least a day. [¶] Anyone who was identifying as a juror and speaking about not looking good for the defendant, I think, quite frankly, it has to be this trial."

53

The court agreed to investigate further. The court stated that it would question each juror individually and that it was "pretty confid[e]nt that this would have been a juror in our case. And, from the Court's perspective, . . . if indeed such a discussion occurred and there isn't a good explanation for it, I don't see any other choice but to excuse that juror."

On December 1, the court told the jury that a student had watched the trial on November 7 and had written a report on it for her class. The court explained that it had received the report because the student mentioned "having a discussion with one of our [male] jurors about this case. So from a due diligence perspective, I'll need to specifically discuss that with each [male] juror to see if that is you." The court added that "nobody is in trouble for this." The court then questioned each male juror individually, asking them whether they had a conversation with a student about parking that included a reference to the case and describing the student's appearance to them. All of the male jurors denied having such a conversation.

After questioning the jurors, the court observed that the interaction was "not ringing a bell with anyone." The court found, "I believe this was such a transitory contact between the juror and the [student] and so benign from that particular individual's perspective that even presuming that it took place, I don't see an adverse impact to these individuals continuing to serve. No one has recalled anything about this contact and I am also taking into account the fact that there is a certain level of inaccuracy with the descriptions offered by this [student] within the report. I think that [the student] was trying to be as genuine as possible, I'm not suggesting she's making something up, but there is certainly a lack of sophistication on her part as to what the process is and what actually was even said during the date that she was here, inaccuracies regarding her description as to what was discussed and presented. [¶] So from the Court's perspective, in light of the fact that we've gone through our due diligence regarding each of these individuals, my intent is to simply proceed with this case."

54

Defense counsel disagreed that the interaction was "benign," observing that the juror's statement that "things don't look good for the defendant, I believe he will be convicted of first-degree murder, that, to me, sounds like somebody has formed an opinion, which is in direct contradiction with the Court's orders, and so I think -- I think simply in that regard, it's worth and warrants an investigation. I am in agreement, however, that I don't know that there's any evidence to suggest that the [jurors] who came in front of the Court this afternoon were being untruthful or, for that matter, the young student herself was somehow being untruthful."

The prosecution stated that there were "many misrepresentations" in the student's report, including that when she observed the trial, Rodriguez had already testified against defendant, which was "factually inaccurate." The prosecution questioned whether the student was "lying" and stated, "[T]here's some things that seem to be very much augmented to paint a much more detailed story there and there are inaccuracies, so I just want to point that out and I agree and I respect your decision with respect to how you've handled this."

When the court asked defense counsel if he had anything further to add, defense counsel declined.

### 2. Legal Principles

"An accused has a constitutional right to a trial by an impartial jury. (U.S. Const., amends. VI and XIV; Cal. Const., art. I, § 16; [citations].) An impartial jury is one in which no member has been improperly influenced [citations] and every member is ' "capable and willing to decide the case solely on the evidence before it" ' [citations]." (*People v. Hamilton* (1999) 20 Cal.4th 273, 293-294.)

Juror misconduct occurs when there is "a direct violation of the oaths, duties, and admonitions imposed on actual or prospective jurors, such as when a juror conceals bias on voir dire, consciously receives outside information, discusses the case with nonjurors, or

55

shares improper information with other jurors." (*People v. Hamilton*, *supra*, 20 Cal.4th at p. 294.)  Prejudgment of a case " 'constitute[s] serious misconduct.' " (*People v. Weatherton* (2014) 59 Cal.4th 589, 598 (*Weatherton*).)  "Misconduct by a juror . . . usually raises a rebuttable 'presumption' of prejudice." (*People v. Hamilton*, *supra*, at p. 295.)

"[W]hether an individual verdict must be overturned for jury misconduct or irregularity ' " 'is resolved by reference to the substantial likelihood test, an objective standard.' " ' [Citation.]  Any presumption of prejudice is rebutted, and the verdict will not be disturbed, if the entire record in the particular case, including the nature of the misconduct or other event, and the surrounding circumstances, indicates there is no reasonable probability of prejudice, i.e., no substantial likelihood that one or more jurors were actually biased against the defendant." (*People v. Hamilton*, *supra*, 20 Cal.4th at p. 296, italics omitted.)

"What constitutes 'actual bias' of a juror varies according to the circumstances of the case." (*People v. Nesler* (1997) 16 Cal.4th 561, 580 (*Nesler*).)  Under the federal constitution, " ' "[t]he theory of the law is that a juror who has formed an opinion cannot be impartial." [Citation.] [¶] It is not required, however, that the jurors be totally ignorant of the facts and issues involved. . . .  It is sufficient if the juror can lay aside his [or her] impression or opinion and render a verdict based on the evidence presented in court.' " (*Id.* at pp. 580-581, italics omitted.)  Under California law, "actual bias supporting an attack on the verdict is similar to actual bias warranting a juror's disqualification." (*Id.* at p. 581.) Thus, actual bias is " 'the existence of a state of mind on the part of the juror in reference to the case, or to any of the parties, which will prevent the juror from acting with entire impartiality, and without prejudice to the substantial rights of any party.' " (*Ibid.*)

"We accept the trial court's credibility determinations and findings on questions of historical fact if supported by substantial evidence.  [Citations.]" (*Nesler*, *supra*, 16 Cal.4th at p. 582; see also *People v. Dykes* (2009) 46 Cal.4th 731, 809 (*Dykes*).)  "Whether

56

prejudice arose from juror misconduct, however, is a mixed question of law and fact subject to an appellate court's independent determination." (*Nesler*, *supra*, at p. 582; *Dykes*, *supra*, at p. 809.)

### 3. Substantial Evidence Supports Implied Finding of No Misconduct

Defendant contends that the juror misconduct violated his federal and state constitutional rights because it resulted in "a biased juror . . . convict[ing] [him]." The trial court, however, never made a finding of misconduct, and we determine that substantial evidence supports the trial court's implied finding that no misconduct occurred.

At the initial hearings on the student's report, the trial court repeatedly expressed concern that if the report was accurate that a male juror told the student that the case was not looking good for defendant and defendant was going to be convicted of first degree murder, the juror could not remain on the jury. But after questioning the student and the male jurors, the court noted the jurors' lack of recollection of "anything about this contact," the inaccuracies in the student's report, and the student's lack of sophistication, and found that any contact between the student and a juror was "benign" and "transitory," impliedly finding that no misconduct—that is, no statement indicating a juror prejudged the case— occurred. While defense counsel disagreed with the court's assessment that the contact was benign, it is clear from the court's statements at the initial hearings on the report that had the court found that a juror made a statement indicating that he had prejudged the case, the court would not have characterized the interaction as benign.

Substantial evidence supports the trial court's finding. The student's report contained several factual errors, including that Rodriguez, defendant's mother, and defendant's former girlfriend had testified on November 7. In actuality, on November 7, the prosecution called two witnesses, an officer and a percipient witness to the shooting.

In addition, when the student was questioned by the court and counsel, she stated that she was uncertain that the juror was from this case and that the juror mentioned that "he was

57

a juror *prior, like, two weeks before when I talked to him*." (Italics added.) The jury in this case was impaneled on November 6, the day before this conversation transpired. The student did not recognize any of the male jurors on the date she was questioned after having been in the courtroom for 45 minutes to an hour and clarified that the juror she spoke to said that he thinks the defendant "will be guilty," but that she added "[of] first degree murder" to the report. The juror did not specify the case on which he served.

Finally, none of the male jurors recalled having a conversation with a student about parking that included a reference to this case. The court and defense counsel believed the jurors.

Based on this record, we conclude substantial evidence supports the trial court's implied finding that no juror misconduct occurred. Because there was no finding of misconduct, the presumption of prejudice, which is rebutted if the record demonstrates that there is no substantial likelihood that a juror was actually biased against the defendant, does not apply. (Cf. *Weatherton*, *supra*, 59 Cal.4th at p. 600 ["Once a court determines a juror has engaged in misconduct, a defendant is presumed to have suffered prejudice."].) Defendant's claim that he was convicted by a biased juror fails.

### H. *Cumulative Prejudice*

Defendant contends that the cumulative prejudice from the trial court's errors and multiple instances of counsel's deficient performance warrants reversal. Because there are no errors to cumulate, defendant's claim fails. (See *In re Reno* (2012) 55 Cal.4th 428, 483; *People v. Sedillo* (2015) 235 Cal.App.4th 1037, 1068.)

Defendant further contends that the prosecutor's misconduct should be cumulated. However, defendant forfeited his claims of prosecutorial misconduct and has not shown that his counsel was ineffective for failing to object to the prosecutor's improper remarks. Regardless, "[w]e have considered each claim on the merits, and neither singly nor

58

cumulatively do they establish prejudice requiring the reversal of the convictions." (*People v. Lucas* (1995) 12 Cal.4th 415, 476.)

## I. *Amendments to Section 186.22 by Assembly Bill 333*

The parties agree that Assembly Bill 333's amendments to the STEP Act, and specifically section 186.22, apply retroactively to defendant and require that we reverse his conviction of active participation in a criminal street gang (§ 186.22, subd. (a)) and vacate the jury's true findings on the gang-murder special circumstance allegation (§ 190.2, subd. (a)(22)) and the gang enhancement allegations (§ 186.22, subd. (b)(1)). We concur.

### 1. Assembly Bill 333

As relevant here, effective January 1, 2022, Assembly Bill 333 amended section 186.22 by narrowing the definition of a criminal street gang and changing the requirements for proving a pattern of criminal gang activity.

When defendant was tried, former section 186.22 defined a " 'criminal street gang' " as "*any ongoing organization, association, or group* of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more [enumerated acts], having a common name or common identifying sign or symbol, and whose members *individually or collectively* engage in, or have engaged in, a pattern of criminal gang activity." (Former § 186.22, subd. (f), italics added.) Assembly Bill 333 amended section 186.22, subdivision (f), to define a criminal street gang as "*an ongoing, organized association or group* of three or more persons, whether formal or informal, having as one of its primary activities the commission of one or more of the [enumerated] acts . . . , having a common name or common identifying sign or symbol, and whose members *collectively* engage in, or have engaged in, a pattern of criminal gang activity." (§ 186.22, subd. (f), italics added.)

Under former section 186.22, subdivision (e), to establish a " 'pattern of criminal gang activity,' " the prosecution had to establish "the commission of, attempted commission

59

of, conspiracy to commit, or solicitation of, sustained juvenile petition for, or conviction of two or more of the [enumerated] offenses, provided at least one of these offenses occurred after the effective date of this chapter and the last of those offenses occurred within three years after a prior offense, and the offenses were committed on separate occasions, or by two or more persons." Now, post-amendment, section 186.22, subdivision (e)(1) requires that "at least one of the[] [predicate] offenses occurred after the effective date of this chapter, and the last of those offenses occurred within three years of the prior offense and *within three years of the date the current offense is alleged to have been committed*, the offenses were committed on separate occasions or by two or more *members*, *the offenses commonly benefited a criminal street gang, and the common benefit of the offense is more than reputational*."[11] (Italics added.) "The currently charged offense shall not be used to establish the pattern of criminal gang activity." (§ 186.22, subd. (e)(2).) And subdivision (g) of section 186.22 now provides that "[a]s used in this chapter, to benefit, promote, further, or assist means to provide a common benefit to members of a gang where the common benefit is more than reputational. Examples of a common benefit that are more than reputational may include, but are not limited to, financial gain or motivation, retaliation, targeting a perceived or actual gang rival, or intimidation or silencing of a potential current or previous witness or informant."

### 2. Analysis

Under *In re Estrada* (1965) 63 Cal.2d 740 (*Estrada*), "[w]hen the Legislature has amended a statute to reduce the punishment for a particular criminal offense, we will assume, absent evidence to the contrary, that the Legislature intended the amended statute to apply to all defendants whose judgments are not yet final on the statute's operative date."

---

[11] Assembly Bill 333 also limited the qualifying predicate offenses that can be used to establish a pattern of criminal gang activity, removing vandalism, looting, and certain fraud-related offenses from the crimes enumerated under section 186.22, subdivision (e). (Legis. Counsel's Dig., Assem. Bill No. 333 (2021-2022 Reg. Sess.).)

(*People v. Brown* (2012) 54 Cal.4th 314, 323, fn. omitted.) "[T]he same reasoning [applies] to statutes which redefine, to the benefit of defendants, conduct subject to criminal sanctions." (*Tapia v. Superior Court* (1991) 53 Cal.3d 282, 301 (*Tapia*).) The *Estrada* rule "applie[s] to statutes governing penalty enhancements, as well as to statutes governing substantive offenses." (*People v. Nasalga* (1996) 12 Cal.4th 784, 792.)

Assembly Bill 333's amendments to section 186.22 "redefine, to the benefit of defendants," the meaning of criminal street gang and the required proof to establish a pattern of criminal gang activity. (*Tapia*, *supra*, 53 Cal.3d at p. 301.) For example, under amended section 186.22, subdivision (e)(1), to establish a " 'pattern of criminal gang activity,' " the prosecution must now prove that the predicate offenses "commonly benefited a criminal street gang, and the common benefit of the offense is more than reputational." Moreover, the prosecution can no longer rely on the charged offense to prove a pattern of criminal gang activity. (§ 186.22, subd. (e)(2).) "As Assembly Bill 333 increases the threshold" of proof, it is an ameliorative change in the law. (*People v. Lopez* (2021) 73 Cal.App.5th 327, 344 (*Lopez*).) Thus, because there is no indication that the Legislature intended Assembly Bill 333 to apply prospectively only and defendant's case is not yet final, defendant is entitled to the retroactive application of section 186.22 as amended by Assembly Bill 333. (See, e.g., *People v. Sek* (Feb. 1, 2022, B309003) __ Cal.App.5th __ [2022 Cal.App. LEXIS 82, at p. *10] (*Sek*) [Assembly Bill 333 "applies retroactively under *Estrada*"]; accord, *Lopez*, *supra*, at p. 477.)

Because this case was tried well before Assembly Bill 333's amendments to section 186.22, "the jury was not asked to, and therefore did not, make the factual determinations that are now required." (*Lopez*, *supra*, 73 Cal.App.5th at p. 346.) For example, to find a pattern of criminal gang activity, the jury was not required to determine that the predicate offenses benefitted the gang and that the benefit was more than reputational, nor was the jury prohibited from relying on the charged offenses as predicates.

61

(§ 186.22, subd. (e)(1), (2).)  And the amendments to section 186.22 affect not only defendant's conviction of active participation in a criminal street gang and the true findings on the gang enhancement allegations, but also the true finding on the gang-murder special circumstance allegation as section 190.2, subdivision (a)(22) requires the jury to find that "defendant intentionally killed the victim while . . . defendant was an active participant in a criminal street gang, as defined in subdivision (f) of Section 186.22, and the murder was carried out to further the activities of the criminal street gang."

"Where, as here, evidence is not introduced at trial because the law at that time would have rendered it irrelevant, . . . remand to prove that element is proper." (*People v. Figueroa* (1993) 20 Cal.App.4th 65, 72; accord, *Lopez, supra*, 73 Cal.App.5th at p.346; *Sek, supra*, __ Cal.App.5th at p. __ [2022 Cal.App. LEXIS 82, at p. *14].)  " 'Because we do not reverse based on the insufficiency of the evidence required to prove a violation of the statute as it read at the time of trial, the double jeopardy clause of the Constitution will not bar a retrial.' "  (*Sek, supra*, __ Cal.App.5th at p.__ [2022 Cal.App. LEXIS 82, at p. *14].)

Accordingly, we will remand the matter for the prosecution to elect whether to retry defendant on the active participation in a criminal street gang count, the gang-murder special circumstance allegation, and the gang enhancement allegations.

### J.     *Amendment to Section 654 by Assembly Bill 518*

The parties agree that Assembly Bill 518's amendment to section 654, which gives trial courts additional sentencing discretion, applies retroactively to defendant.  We concur.

#### 1.     Assembly Bill 518

Section 654 prohibits multiple punishment for a single act or omission.  (See *People v. Delgado* (2017) 2 Cal.5th 544, 570.)  At the time of sentencing, section 654 required the trial court to impose punishment "under the provision that provide[d] for the longest potential term of imprisonment."  (Former § 654, subd. (a).)

Effective January 1, 2022, Assembly Bill 518 amended section 654 to give trial courts discretion to select the provision on which to impose punishment. As relevant here, section 654 now provides, "An act or omission that is punishable in different ways by different provisions of law *may be punished under either of such provisions*, but in no case shall the act or omission be punished under more than one provision." (§ 654, subd. (a), italics added.)

### 2. Analysis

Assembly Bill 518's amendment of section 654 effected an ameliorative change to the law as trial courts are no longer required to impose sentence under the provision that provides for the longest term of imprisonment when a defendant is convicted of multiple crimes for a single act or omission. Thus, as the parties agree, under the *Estrada* rule discussed above, defendant is entitled to the retroactive application of section 654 as amended by Assembly Bill 518 because there is no indication that the Legislature intended the law to apply prospectively only and this case is not yet final on appeal. (See *People v. Superior Court* (*Lara*) (2018) 4 Cal.5th 299, 308-309 [the *Estrada* rule applies to legislation that ameliorates possible punishment]; *Sek*, *supra*, __ Cal.App.5th at p. __ [2022 Cal.App. LEXIS 82, at p. *21] [Assembly Bill 518 applies retroactively].)

The trial court imposed punishment on counts 1 and 4 and, pursuant to former section 654, imposed and stayed punishment on counts 2, 3, and 5. Specifically, on count 1, the trial court imposed LWOP for special circumstances murder plus a consecutive 25 years to life for a section 12022.53, subdivision (d) firearm enhancement; and on count 4, the court imposed a consecutive five years for shooting from a motor vehicle plus a consecutive 25 years to life for a section 12022.53, subdivision (d) firearm enhancement. The court either struck or stayed the punishment for the additional sentence enhancements on those counts. On count 2, the court imposed and stayed pursuant to section 654 a five-year sentence for shooting from a motor vehicle and imposed and stayed the punishment for the

sentence enhancements; on count 3, the court imposed and stayed pursuant to section 654 a three-year sentence for assault with a deadly weapon and imposed and stayed the punishment for the sentence enhancements; and on count 5, the court imposed and stayed pursuant to section 654 a two-year sentence for active participation in a criminal street gang.

Accordingly, because amended section 654 gives trial courts newfound discretion to select the provision on which to impose punishment when a defendant is convicted of multiple crimes for a single act or omission, we will remand the matter for resentencing.[12]

## IV.    DISPOSITION

The judgment is reversed.  Defendant's conviction of count 5 for active participation in a criminal street gang (Pen. Code, § 186.22, subd. (a)) is reversed; the jury's true finding on count 1 of the gang-murder special circumstance allegation (Pen. Code, § 190.2, subd. (a)(22)) is vacated; and the jury's true findings on counts 1 through 4 of the gang enhancement allegations (Pen. Code, §186.22, subd. (b)(1)) are vacated.  On remand, the prosecution may elect to retry defendant on count 5; the gang-murder special circumstance allegation on count 1; and the gang enhancement allegations on counts 1 through 4.  If the prosecution elects not to retry defendant, the court shall resentence defendant on the remaining counts and allegations, applying the amended version of Penal Code section 654. If the prosecution elects to retry defendant, at any resentencing the court shall apply the amended version of Penal Code section 654.

---

[12] Because we are remanding the matter for resentencing, we do not reach defendant's claims that his LWOP sentence is cruel and unusual and that the trial court improperly imposed various fines and fees without determining his ability to pay.

_____
BAMATTRE-MANOUKIAN, J.


WE CONCUR:




_____
ELIA, ACTING P.J.




_____
DANNER, J.




*People v. Rosales*
**H045615**